## NICKMAN v. NEW YORK LIFE INS. CO.
### No. 5492.

Circuit Court of Appeals, Sixth Circuit.
April 11, 1930.

J. A. Cline, of Cleveland, Ohio (Cline & Patterson, of Cleveland, Ohio, on the brief), for appellant.

A. D. Baldwin, of Cleveland, Ohio (Garfield, Cross, MacGregor, Daoust & Baldwin, of Cleveland, Ohio, on the brief), for appellee.

Before DENISON and HICKS, Circuit Judges, and ANDREW M. J. COCHRAN, District Judge.

HICKS, Circuit Judge.

Suit upon three life insurance policies each providing for double indemnity "upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause. * * *" Appellant (plaintiff below) assigns error upon the ruling of the court directing a verdict for defendant upon the ground that the death of the insured, Nickman, did not result from bodily injury effected through accidental cause. There is substantial evidence that the insured died from sunstroke. There is much controversy over whether sunstroke is a disease, or is to be classed as bodily injury effected through violent and external means. We do not deem it necessary to decide the point. Assuming that death resulted from bodily injury, we conclude that there is no substantial evidence that such injury was effected through accidental cause.

Nickman, fifty years old, weighing one hundred and forty-five pounds, in good health, a partner in a real estate firm in Cleveland, Ohio, left his home on Edington Road, Cleveland Heights, about 9 o'clock a. m., August 3, 1928. At that hour, according to the United States Weather Bureau, the temperature in Cleveland registered eighty-three degrees. He took his two sons to a barber shop, returned home and went from there to a point on Fifty-Seventh street off Euclid avenue, where one Zaslovsky was roofing a building for him. He remained there from 9:30 to about 11:45. He spent 35 or 40 minutes of this period standing near a hot kettle in which tar was being prepared for the roof, and engaging in an argument with Zaslovsky over the price of the work. The building was one story, about 8½ feet high and 40 feet long, and somewhat surrounded by taller buildings. While there, he went upon the roof three or four times by means of a ladder and watched the work. About 12 o'clock he went to his office in the Schofield building. He then went upon an errand and returned to the building about 12:30. He there had a conference with his partner upon a business matter, and then went to the office of an abstract company about 1,500 feet away. He returned to the office about 2:15 or 2:20, sick and dizzy. His head was hot, his face red, he held his head in his hands, visited the toilet and went out into the hall for water at 10 or 15 minute intervals. He left the office about 2:50, went to a bank some 1,500 feet away and thence home, where he arrived about 4 o'clock. His condition soon became alarming. He was very red, very dizzy, and breathed with difficulty. He vomited and became unconscious. His temperature was between 107 and 108 degrees. He was taken to a hospital where he died in about an hour and a half after his arrival there.

Although it be accepted that Nickman's death was caused by his exposure to excessive heat, it is just as evident that it was not caused by accident. The high temperature was not an accident any more than excessive cold or an extraordinary storm. It was an unusual atmospheric condition, but it was not unnatural, nor did it spring up suddenly after Nickman left home. The lowest temperature was 74° at 6 a. m. It was 79° at 9 o'clock and 83°, at 10 o'clock. There was a gradual rise until the maximum, 92°, was reached a few minutes after 4 p. m. The mean temperature for the day was 83° or 11° higher than normal for August 3d. From the time he left home, the excessive heat certainly affected Nickman's sensibilities just as it did that of all other persons in Cleveland similarly exposed. It cannot be reasonably thought that he did not foresee the phenomena of a rising temperature. The workmen on the roof foresaw and wore wet cloths under their hats to protect themselves. Nothing occurred at any time to cause the insured to be involuntarily exposed. He went exactly when, where, and as he intended to go throughout the day. He did just as he intended to do. He was exposed by no mishap or misadventure as in Elsey v. Fid. & Cas. Co., 187 Ind. 447, 120 N. E. 42, L. R. A. 1918F, 646, where the insured suffered a sunstroke because a street car in which he was sitting had been drawn from the shade into the sun; or, as in Richards v. Stan. Acc. Ins. Co., 58 Utah, 622, 200 P. 1017, 17 A. L. R. 1183, where from misinformation as to the distance to be traveled into the desert, the insured took an insufficient supply of water; or, as in the illustration in the English case of Sinclair v. Maritime Passengers Assur. Co., 3 El. & El. 487, of one at sea in an open boat by reason of shipwreck; or, as in

Manufacturers Acc. Indem. Co. v. Dorgan (C. C. A.) 58 F. 945, 953, 22 L. R. A. 620, where the insured, unconscious from a temporary affliction, fell into a brook and drowned; or, as in Ashley v. Agr. Life Ins. Co., etc., 241 Mich. 441, 217 N. W. 27, 58 A. L. R. 1208, where a hunter became lost and died from freezing; or, as in the common illustration of one, deprived of his vehicle, being compelled to walk an inordinate distance in the heat of the sun. Other apt illustrations will readily occur. Here nothing affected the insured's power to will, to choose, or to direct his movements. There was nothing accidental in walking the streets, standing near the hot kettle, climbing the ladder, or standing upon the roof. These were all intentional acts. He did not, of course, intend to be stricken, and his death was therefore unexpected, but it was not caused by accidental means. The best that may be said for plaintiff's case is that the insured's death was unexpectedly brought about by acts which the insured himself intentionally committed. While going about his business affairs, he simply exposed himself to the heat longer than his body could endure.

We think, therefore, that the case is controlled by United States Mutual Association v. Barry, 131 U. S. 100, 121, 9 S. Ct. 755, 33 L. Ed. 60, as construed by this court in Pope v. Prudential Ins. Co. of America, 29 F.(2d) 185, 186, wherein Judge Denison said:

"The evidence recited, what the court had said in its charge to the jury, and the comments of the Supreme Court, all indicate that the approved theory of recovery was that there had been some slip or mishap attending Barry's act in jumping to the ground, whereby his intended act was, as to the manner of its execution, transformed into an unintended one."

In the same case, the court also said:

"There is no occasion to deny that a death, so resulting, may be in a very proper sense an accidental death; but there is obviously a substantial distinction between an accidental result and the result of an accidental cause. We think it not only to be the natural meaning of the words, as they would be understood by the ordinary policyholder, but the right construction thereof, supported by the weight of authority, that when the insured or those acting with his consent did precisely what they intended to do and in the way which they intended, knowing that injury often did result and might be unavoidable, and where there was no slip or misstep in the performance, and where there was no

ignorance of any material factor, this conduct cannot be said to have been the accidental cause of the injury which unfortunately may follow."

Continental Casualty Co. v. Pittman, 145 Ga. 641, 89 S. E. 716, and Harloe v. Calif. State Life Ins. Co. (Cal. Sup.) 273 P. 560 (both sunstroke cases) are in accord. See also Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S. W. 907, 39 A. L. R. 56; Stone v. Fid. & Cas. Co., 133 Tenn. 672, 182 S. W. 252, L. R. A. 1916D, 536, Ann. Cas. 1917A, 86. We are aware that the highest courts of other jurisdictions entertain divergent views as in the cases of Bryant v. Continental Cas. Co., 107 Tex. 582, 182 S. W. 673, L. R. A. 1916E, 945, Ann. Cas. 1918A, 517, and Higgins v. Midland Cas. Co., 281 Ill. 431, 118 N. E. 11, each of which differs from the Pope Case in its interpretation of the Barry Case. In such cases as Mather v. London Guarantee & Acc. Co., 125 Minn. 186, 145 N. W. 963, and Railway Officials, etc., Ass'n v. Johnson, 109 Ky. 262, 58 S. W. 694, 52 L. R. A. 401, 95 Am. St. Rep. 370, peculiar policy contracts were involved. Other cases tried under some particular statute might be cited, and still other cases such as Continental Cas. Co. v. Clark, 70 Okl. 187, 173 P. 453, L. R. A. 1918F, 1007, are diametrically in opposition. However, we think the true rule is announced in the Pope Case, and is applicable here, and we are content to follow it.

The judgment is, therefore, affirmed.