158 So. 192

**SOVEREIGN CAMP, W. O. W., v. GUNN.**

**7 Div. 257.**

Supreme Court of Alabama.

Nov. 22, 1934.

Rehearing Denied Jan. 3, 1935.

Wm. B. McCollough and Jim Gibson, both of Birmingham, for appellant.

L. H. Ellis and W. W. Wallace, both of Columbiana, for appellee.

BROWN, Justice.

This case has been considered on two appeals previous to the present appeal. Sovereign Camp, W. O. W., v. Gunn, 224 Ala. 444, 140 So. 410; Id., second appeal, 227 Ala. 400, 150 So. 491.

The case as presented on the last trial and this appeal is different in only one material aspect. On the first two trials the complaint contained counts declaring on the general obligation of the policy insuring the life of Willie C. Gunn, and naming his wife, Mary M. Gunn, as the beneficiary, and also a count declaring on the special obligation providing for double indemnity, but on the last trial the counts declaring on the general obligations were eliminated by amendment, and the case went to trial on the third count claiming double indemnity. That count avers that the death of said Gunn "resulted directly and independently of all other causes from bodily injury effected solely through external, violent *and accidental means.*" (Italics supplied.)

The general issue pleaded by the defendant, the averments of count 3, imposed on the plaintiff the burden of proving, not only that said death resulted directly from bodily injury effected solely through external, violent, *and accidental means*, but that said death resulted from such accidental means "independently of all other causes"; that is, it was not the result of violence intentionally invited by the insured, or violence intentionally inflicted by the beneficiary Mary M. Gunn, or brought about through her connivance with another. Protective Life Ins. Co. v. Swink, 222 Ala. 496, 132 So. 728; Sovereign Camp, W. O. W., v. Gunn, 227 Ala. 400, 150 So. 491; Prudential Casualty Co. v. Curry, 10 Ala. App. 642, 65 So. 852.

To meet and carry this burden, the plaintiff relied, mainly, on the testimony of the witness Mary M. Gunn, to the general effect that while witness and the insured, her husband, were traveling along the highway in an automobile being driven and controlled by witness, three men held them up and robbed them. She testified, in part: "The night Mr. Gunn was shot we were on a trip to Jacksonville. We left the station about 6:00 or 6:30 o'clock, but took no definite note of the time. We had started to Jacksonville where our daughter was going to be in the commencement exercises that night. We had a pistol there at the store and we got it from Jack Persons. He loaned it to us. I would say it was several weeks before Mr. Gunn got killed. The occasion for Mr. Persons leaving the pistol there was when he came there he said that the gun Mr. Gunn had was just a toy gun and he would let us have one that was a good one. Mr. Persons was a policeman, we had just been robbed, and he was up there investigating a robbery. We had a pistol and a gun in the store and they were taken when the store was robbed. My husband had been able to get a little pistol that Persons said was no account but he loaned us a good one. This was the occasion for us having the pistol at the store. On the night we made the journey to Jacksonville we had the pistol in the car. We were accustomed to carrying the pistol on trips like this, and that was nothing unusual about it. We always carried it. When we came to this little bridge beyond Talladega, this side of Oxford, and this side of Choccolocco Creek, there is a little bridge just before you get to Choccolocco Creek. Choccolocco Creek has a bridge over it of steel construction. The bridge wasn't a covered bridge, but steel supported, to the best of my recollection. This trouble occurred on this side of that bridge at another small bridge. This bridge was very close to the other bridge, but I can't tell you just how far. As we were going along we saw a car parked on the right side of the road, headed toward Anniston and out in front of there were three men, two tall and one low, and they waved us to stop, and we had passed their car and were almost straight in the road when they flagged ours. They were some distance in front of our car. They flagged us with their hands. Mr. Gunn asked me was I going to stop, and I says, 'Yes, we may can help them some way.' We stopped and there were two tall men came on my side and the low one on Billy's side. Billy is my husband, and they opened the door on my side and one of them says, 'Hands up, give us your money.' I suppose that just one of them opened the door and he said, 'Hands up, give us your money.' It was dark. The one on Billy's side was a small man, and the two large men were on my side of the car. When they said, 'Hands up, give us your money,' I said, 'I will give you all I have,' and he

reached across my bosom towards Billy, and they scuffled across me and a shot rang out. He reached right across my bosom towards my husband. He just fell across me with his entire body, just went across me. I do not know what my husband was doing while this was going on. He was down over me and I couldn't see anything, and he was struggling with my husband, and the shots rang out. I will say there were some two or three shots fired. After the shots were fired or after some were fired Billy said, to me, 'Mother are you hurt?' I said, 'Yes, I am shot.' I said, 'I have a sweet baby to live for,' I said, 'I will give you all I have.' At this time the man was still across me scuffling with Billy. When he began raising up I told him, 'I will give you all I have,' he said, 'Hush, lassie, or I will hurt you.' When he raised up he was still holding my left arm. And I reached down to get the purse and gave it to him. My purse was lying under the edge of the seat of the car on the floor. I had a pair of shoes I had pulled off on the floor and I had put on a pair to drive in. I used these shoes to drive the car. The others were dress shoes to use when I got to Jacksonville. When I reached down to get the purse there was a car coming meeting us. It was on beyond the bridge when I first saw it. I put the car in gear while he was holding me with his arm and pulled loose from him and went on and passed this car just before I got to the covered bridge. * * * After I started my car up I did not notice which way the men went. The only thing indicating there was a car starting up was a little light come on in the mirror of my car. I could see the light behind me in the mirror. I drove on and met this other car. I kept going. I asked for help. I said, 'Murder, help, help, murder,' I couldn't tell you how fast I was driving, and I also screamed and hollowed. I met another car before I got to Oxford, up at the bend of the road. I hollowed again but it kept going. I know that Oxford was only a short distance ahead because I had been over the road before. The nearest house to the place where my husband was shot is Mrs. Canada's, I have been back there since and saw the Canada house. Her house is not so very far from them, but I can't remember just exactly how far it is. That night I did not see the Canada's house or anything like that. I didn't see any house at all until I got almost in the confines of Oxford. When I got into Oxford I hollowed for help and I was screaming and a man came running out into the road. We went on into Anniston with my husband. Some one got in the car at Oxford. I don't know anything about anybody jumping out of the car. I remember Mr. Sparks overtaking me and getting in the car with me. I did not know at the time that my husband was dead. I asked for help and a doctor when I got to Oxford. They said we would have to carry him to the hospital, in fact they tried to get a doctor. They said they couldn't find one there and we would have to carry him to the hospital. At that time I did not know that Mr. Gunn was dead. Mr. Gunn spoke one time after he was shot. He spoke while they were shooting and scuffling, and that was the only time he spoke. He asked me if I were hurt, and I told him I was shot. From there on I knew that he was shot because the blood was flying on me and he didn't talk to me. He was laying back on the seat and his legs were cross me this way (indicating). His legs were across me and in fact he was sitting almost on top of me. I had a $5.00 bill and a $1.00 bill and some change in my purse. I think I had a powder puff and handkerchief, and a house key pinned in there with some pins. I didn't pay any attention to the pistol being gone and didn't know that it was gone. I didn't know anything about it until they said something about the gun at the trial. I didn't know what became of the pistol that night. The nurse told me at the hospital that he was dead. They carried him into the hospital, but I didn't know that he was dead, but I did know that he was shot. I didn't know he was dead. I did not shoot my husband. He was shot there just like I told the jury."

■ While the witness denies that she shot insured, she does not affirmatively deny that these alleged robbers were on the highway by her procurement or connivance, but the general tendency of her testimony negatives these facts, and, at least, amounted to a scintilla of evidence, making a jury question, and justifying the refusal of the affirmative charge.

■ If, as Mrs. Gunn's evidence tended to show, the said three men were on the highway without her connivance, and they in fact assaulted the Gunns in an effort to rob them, they (the Gunns) had the right to resist, even unto the death of their assailants, and were under no duty to retreat. Storey v. State, 71 Ala. 329; 18 A. L. R., note, page 1290; 13 R. C. L. p. 828, § 134.

■ While the general statement in the court's charge to the jury, that, "if the plaintiff reasonably satisfies the jury from the

evidence that all the material averments of the complaint were true, she made out a prima facie case, and without anything further would be entitled to recover," is of doubtful value as an instruction, it nevertheless is not unsound.

■ Under the issues as framed, the plaintiff was entitled to recover the double indemnity, or nothing. Nevertheless the instruction in the oral charge excepted to and made the predicate for assignment of error 75 does not constitute reversible error; inasmuch as the verdict of the jury awarded the plaintiff the double indemnity.

■■ The question of the plaintiff's right to bring the suit in her own name could only be raised by plea in abatement, and the fact that she had become of age after the suit was brought and before the trial cured the irregularity, if any there was, in the proceeding. Howland v. Wallace, 81 Ala. 238, 2 So. 96; Wyrosdick v. Age-Herald Pub. Co., 217 Ala. 657, 117 So. 28. Therefore the transcript of the proceedings removing plaintiff's disabilities of nonage and the testimony upon which the decree was granted were wholly immaterial to any issue in the case, and were obnoxious to the defendant's objection, which was erroneously overruled by the court.

■ The court erred in overruling the defendant's objection to the several questions eliciting testimony from the witness Mary M. Gunn; that she kept no servants in her home; that she did the family washing; that she had no one to do house cleaning or housekeeping; that she made all her daughter's clothes, and how long she had been doing all such things. This testimony falls short of the test of relevancy. Whitaker v. State, 106 Ala. 30, 17 So. 456; Smith v. State, 13 Ala. App. 411, 69 So. 406.

It seems to have been admitted on the theory that it had some tendency to prove that the insured's financial income was such as to enable him to carry large insurance on his life and pay comparatively large premiums thereon. If he had any income from other sources than his daily labor, for which he received two dollars and a half per day when he worked, it would seem more reliable evidence if the facts could be produced. The testimony admitted at most injected into the case a mere matter of conjecture that tended to excite sympathy and draw the minds of the jury away from the issues before them.

■ The dominating issue on the trial was whether or not the beneficiary shot and killed the insured, and it was permissible for the defendant to show that the insured, a few days before his death, applied to McNeill, the agent who issued the policy, for its cancellation, and the insured's statement in respect to such cancellation. This testimony was not subject to the objection that it was res inter alios acta, or that it was irrelevant and immaterial. This testimony, in connection with what followed immediately between the agent, the beneficiary, and the insured, tended to show motive on the part of the beneficiary for causing the insured's death.

■ After full and careful consideration of the evidence, we are impelled to hold that the verdict of the jury is contrary to the great preponderance of the evidence, and should not be allowed to stand. As was held on the second appeal, the proceedings and judgment of the circuit court are prima facie evidence that the insured was murdered by the beneficiary, Mary M. Gunn, and this, in connection with the fact that the testimony of Mrs. Gunn is discredited and her story is unreasonable, impels us to hold that the court erred in not granting the new trial. Sovereign Camp, W. O. W., v. Gunn, 224 Ala. 444, 140 So. 410.

If the plaintiff elects to proceed with another trial, we deem the foregoing and what was said on the former appeals a sufficient guide to the court and the parties, and therefore we pretermit consideration of other questions which may not arise on another trial.

For the errors noted, let the judgment be reversed and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.