10 So.2d 292
**COMMERCIAL CASUALTY INS. CO. v. LLOYD.**

7 Div. 716.

Supreme Court of Alabama.

Oct. 8, 1942.

Rehearing Denied Nov. 12, 1942.

Coleman, Spain, Stewart & Davies, of Birmingham, for appellant.

418

Merrill & Merrill, of Anniston, for appellee.

GARDNER, Chief Justice.

The suit is upon a policy commonly known as "burglary insurance". Plaintiff insists in his complaint and proof that his iron safe situated in the office of his bakery business in Anniston, Alabama, was on the morning of April 17, 1938, burglarized, resulting in the loss of money and securities. There was verdict and judgment for $880 from which the defendant company prosecutes this appeal.

The policy provided in the insuring and covering clause as follows: "Indemnity for loss—1. To indemnify the Assured for loss by burglary, which shall mean the felonious abstraction of any of such insured property from within the insured part (as specified in Item 8 of the Declarations) of such safe or vault, by any person or persons making felonious entry into such safe and such insured part thereof, and also into the vault, if any, containing such safe, when all doors of such safe and vault are duly closed and locked by all combination and time locks thereon; provided that such entry shall be made by actual force and violence of which there shall be visible marks made by tools, explosives, electricity, gas or other chemicals, upon the exterior of (a) all of said doors of such safe and of the insured part thereof and of the vault, if any, containing such safe, if entry is made through such doors; or (b) the top, bottom or walls of such safe and of the insured part thereof and of the vault, through which entry is made, if not made through such doors. If only the vault and not the safe, if any therein, is so entered, the Company's liability shall not be greater than the respective amounts stated in Section (e) of Item 8 of the Declaration;" There was proof the doors of the safe were closed and locked as provided in the above clause and there were marks of violence both upon the outer and inner doors of the safe.

When discovered the outer door was open, with marks upon it "looked like

pipe wrench marks" and its handle was bent, though it was locked by the combination. The inner door was also open and the locking mechanism was on the floor in front of the safe. The handle was bent. Plaintiff stated the lock on the inside door was broken. "There were pieces of it laying on the floor", and the handle of the inside door was "twisted". Photographs of the safe disclosed some indentations. We omit details of proof and rest content with statement of our conclusion the proof was sufficient for the jury's consideration as to whether or not the alleged loss came within the coverage of the policy. See authorities cited on page 857-859, 41 A.L.R.; Vol. 5 Couch Ency. of Insurance Law, § 1184; American Surety Co. v. Southern Oil Stores, 24 Ala.App. 114, 133 So. 298. The affirmative charge requested by defendant was properly refused. ·

■ The delivery of the insurance policy to the insured and its possession by him, and also his renewal certificate in his possession, suffice to show a consideration, an extension of credit express or implied, and the argument the affirmative charge was due defendant for failure to make proof of payment of the premium is without merit. 26 C.J. 61; Queen Ins. Co. v. Bethel Chapel, 234 Ala. 184, 174 So. 640; Title 7 Section 374, Code 1940.

The discussion to be found in Globe & Rutgers Fire Ins. Co. v. Eureka Sawmill Co., 227 Ala. 667, 151 So. 827, involving an oral contract to insure (as distinguished from contracts in writing governed by Title 7, § 374, Code 1940) sufficiently discloses, without further comment, the reasoning upon which the above conclusion is reached.

The money and securities were shown to have been placed in a money bag inside a paper bag. Plaintiff had no connection with placing the money in the bag and was not present when it was done. He was at the hotel in Anniston and on Saturday night his employees carried this bag to his home and delivered it to his wife. Plaintiff's wife suffering from "sick headache" under physician certificate did not testify and no "showing" as to her testimony was offered by plaintiff.

■ Clearly, therefore, as to the amount of money in the bag when placed in the safe by plaintiff who did never count it, there was an important missing link in the proof and the objections interposed to his testimony upon this theory were well taken.

His own testimony discloses reliance upon this point was purely hearsay. Counsel for plaintiff replies that if there was error it was without injury,. upon the theory defendant subsequently offered the testimony of plaintiff taken, on former trial which contained such statement without objection. We doubt the soundness of this contention, but pass the matter of error without injury without definite decision as we entertain the view the cause is due to be reversed upon other grounds now to be considered.

■■ Plaintiff alleged in his complaint, pursuant to the language of his policy that his safe was burglarized and the burden of proof rested upon him to reasonably satisfy the jury of this fact. Cantor v. National Surety Co., 208 App.Div. 370, 204 N.Y.S. 35; Marian Cloak Co. v. American Surety Company, Sup., 190 N.Y.S. 577. That the contents of the safe were removed by plaintiff or through his procurement would, of course, be wholly inconsistent with the allegations of the complaint that the safe had been burglarized, and was properly presented under the plea of the general issue.

■ As said in Fidelity-Phoenix Ins. Co. v. Murphy, 226 Ala. 226, 146 So. 387, 388, "if the substance of the plea is inconsistent with the complaint, it is but an expression of the particular claim of the defendant as to why the complaint is not true, and which is embraced in the general issue". See also Employers Insurance Co. v. Diggs, 234 Ala. 425, 175 So. 344.

■ In view of the issue thus presented we think the trial court too narrowly restricted defendant in its proof. The burden resting upon plaintiff to show that his safe had been burglarized, any material evidence tending to the contrary, though it may place plaintiff himself under suspicion, should be submitted to the jury for their consideration. The circumstances surrounding this particular loss were somewhat unusual and sufficient to reasonably arouse inquiry.

The loss was discovered by an employee Monday morning. There was no pretense of any indication of a forcible entry into the building or into the office on the second floor where the safe was located. The outer doors of the building were locked on Monday morning at the time the alleged burglary was discovered, the office was also locked and the combination and lock on the outer door

of the safe were not materially damaged and when found the outer safe door was open, the combination locked and the bolts thrown. The combination was unlocked and has been working and in constant use since that time. As to the inner door there is much proof tending to show the locking mechanism was not broken but removed by unscrewing a nut on the inside of the door thereby releasing the locking mechanism which was found on the floor, and when the employees of plaintiff so discovered it they reassembled the locking mechanism and then replaced the inner door and it has worked continuously without further repair.

The testimony of Powell, the expert, was to the effect that entry could be effected into the safe only by unlocking the combination on the outer door or breaking the lock. The proof was the lock was not broken nor was the combination to the safe damaged, and twisting the handle on the inner door was without effect on the locking mechanism. Only plaintiff and a trusted employee, Miss Huggins, against whom no suspicion points, had the combination to the safe. The key to the inner door was in the office. It was either in the night before or early morning of the 18th when the burglary occurred.

Plaintiff went to his place of business about 7:30 o'clock Monday morning but evidently stayed only a short time and states he did not look into the office. He learned of the burglary about ten o'clock Monday morning when his wife telephoned him at the hotel. He did not go to his office until three o'clock that afternoon in company with Turner the Chief of Police.

Turner testifies that it looked to him as an "inside job". The outer door appeared to him not to have been "tampered with" and that it had been unlocked by the combination. The inner door had "apparently been unlocked", and the locking mechanism removed by taking out the screws from the rear of the door. Plaintiff admits he told Turner "it looked like an inside job", and he made no request of Turner for further investigation. Plaintiff now explains on the trial that by the expression "inside job" he meant so far as breaking into the building was concerned. But there was no such explanation when the conversation occurred. Plaintiff says he placed the money in the safe between ten and twelve o'clock Sunday morning. He insists the amount of the loss was $730 in cash and $68.85 in unrecovered checks. Defendant offered to show in varying ways, statements both verbal and written to Hamilton, defendant's agent, and questions propounded to plaintiff on cross-examination of him as a witness, substantially the following proof to which in each instance the court sustained objections interposed by plaintiff: That plaintiff was drinking heavily on Friday night before the loss of the money, also on Saturday, and Saturday night, Sunday and Sunday night; that on Friday night he went to the hotel in Anniston and engaged in gambling; that he won about $400 and remained in the game until two o'clock Sunday morning; the game was broken up and continued elsewhere and then returned to the hotel and he got into a dice game, had been drinking heavily; that he lost what he had won and $800 besides; the game broke up Monday morning and plaintiff lay down and went to sleep.

■ The Chief of Police, testifying the combination to the outer door was in order and without any marks of violence and that it was unlocked by the combination, after stating it was an inside job, was asked if he told plaintiff that someone had opened the safe by working the combination and that the inside door had been unlocked with a key, and objection was sustained, as well as also to the further question if plaintiff, after their conversation made request for any further investigation. This was error. Greenwood v. Bailey, 28 Ala.App. 362, 184 So. 285; 22 C.J. 321; 31 C.J.S., Evidence, § 294.

■ Objection was also sustained to the question propounded to witness Hamilton as to whether or not in his interview with plaintiff the latter appeared nervous. This was the afternoon of the day the burglary was alleged to have been discovered and we think the proof should have been allowed. Alabama Power Company v. Smith, 229 Ala. 105, 155 So. 601; Southern Natural Gas Co. v. Davidson, 225 Ala. 171, 142 So. 63.

■ We conclude also the trial court should have permitted the numerous details of proof hereinabove very generally outlined as to plaintiff's conduct during the period inquired about as it bore upon a material issue in the case. It was proof to be considered by the jury in their deliberations as to whether or not they were reasonably satisfied that in fact a burglary had been committed.

Ins. Co. v. Erickson [8 Cir.] 42 F.2d 997; Jensma v. Sun Life Assur. Co. [9 Cir.] 64 F.2d 457 [supra]; Order of United Commercial Travelers v. Shane [8 Cir.] 64 F.2d 55; Contra, Mutual Life Ins. Co. v. Dodge [4 Cir.] 11 F.2d 486, 59 A.L.R. 1290. An injury from sunstroke, when resulting from *voluntary exposure* by an insured to the sun's rays, even *though an accident,* see Ismay, Imrie & Co. v. Williamson, [1908] A.C. 437, has been generally held not to have been caused by external accidental means. Nickman v. New York Life Ins. Co. [6 Cir.] 39 F.2d 763; Paist v. Aetna Life Ins. Co. (D.C.) 54 F.2d 393; Harloe v. California State Life Ins. Co., 206 Cal. 141, 273 P. 560; Continental Casualty Co. v. Pittman, 145 Ga. 641, 89 S.E. 716; Semancik v. Continental Casualty Co., 56 Pa.Super. 392; see Elsey v. Fidelity & Casualty Co., 187 Ind. 447, 120 N.E. 42, L.R.A.1918F, 646; Richards v. Standard Accident Ins. Co., 58 Utah 622, 200 P. 1017, 17 A.L.R. 1183; Contra, Continental Casualty Co. v. Bruden, 178 Ark. 683, 11 S.W.2d 493, 61 A.L.R. 1192; Lower v. Metropolitan Life Ins. Co., 111 N.J.L. 426, 168 A. 592."

The Supreme Court of Louisiana, in the recent case of Parker v. Provident Life & Accident Ins. Co., 178 La. 977, 152 So. 583, committed itself unequivocally to the proposition that distinction is to be recognized and enforced between an accidental result and a result produced by accidental means. This holding is directly in line with our holding in the case of Northam **v.** Metropolitan Life Ins. Co., supra.

The Supreme Court of Iowa, in the case of Riley v. Interstate Business Men's Accident Ass'n, 152 N.W. 617, 619, observed: "There is a difference between an accidental result and an accidental cause. * * * It is apparent that to entitle one to recover, under a policy like the one in question, it is not sufficient to show that the death was accidental. Death is the result of some precedent act or condition. It is traceable to some cause. It is not sufficient, to make the cause accidental, that it appear that the resulting death was unanticipated, unforeseen, and not expected as a result of the act done. It must appear that that which happened to produce the result happened through accident, in order that the proper foundation may be laid for the recovery. The policy provides recovery in the event of death, but only where death results from

bodily injuries effected solely by external, violent, and accidental means."

In Schmid v. Indiana T. Acc. Ass'n, 42 Ind.App. 483, 85 N.E. 1032, 1037, and Elsey v. Fidelity & Cas. Co., Ind.App., 109 N.E. 413, the rule in Indiana is stated as follows:

"If the result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means," and that, "where an injury occurs as the direct result of intentional acts, it is not produced by accidental means."

The Indiana rule was adopted and followed by the federal courts in the case of Lewis v. Iowa State Traveling Men's Ass'n, D.C., 248 F. 602, and affirmed in 8 Cir., 257 F. 552.

Mr. Cooley, in his briefs on Insurance, 2d Ed., vol. 6, p. 5235, announces the following rule: "A person may do certain acts, the result of which may produce unforeseen consequences, and may produce what is commonly called accidental injury; but when the means are exactly what he intended to use and used, the means are not accidental within the meaning of the policy."

In the case of U. S. Fidelity & Guaranty Co. v. Blum, 9 Cir., 270 F. 946, 947, the court held: "There is a distinction between accidental death which may be an unexpected or unintentional result of a voluntary act, and death from accidental means, which must result from some unforeseen or unintentional act."

In Smith v. Travelers' Ins. Co., 219 Mass. 147, 106 N.E. 607, 608, L.R.A.1915B, 872, it was observed: "It is not sufficient that the death or the illness that caused the death may have been an *accidental result* of the *external cause,* but that *cause itself* must have been, not merely external and violent, but also *accidental."* (Italics supplied.)

In Clidero v. Scottish Accident Ins. Co., 29 Scot.L.R., 303, Lord Adam observed: "The question, in the sense of this policy, is not whether death was the result of accident in the sense that it was a death which was not foreseen or anticipated. That is not the question. The question is, in the words of the policy, whether the means by which the injury was caused were *accidental means."* (Italics supplied.)

422

In the case of Smith v. Metropolitan Life Ins. Co., La.App., 155 So. 789, it was held that death of an employee who, while performing regular duties of washing out a boiler, became overheated, and who later died of heat and exhaustion, was not caused by *accidental means* within double indemnity provision of group insurance. (Italics supplied.) The terms of the policy were the same as here.

In the case of Scott v. Metropolitan Life Ins. Co., 169 Tenn. 351, 87 S.W.2d 1011, the Supreme Court of Tennessee, in construing a policy similar to the one in the instant case, in an opinion by Chief Justice Green, held that the insured's death from sunstroke, or heat prostration, while firing a boiler in a mill, did not result through *"'accidental means'* within double indemnity provision .of life policy, in absence of allegation that insured's exposure was other than voluntary and intentional, or that heat from boiler was unforeseen, unexpected, or unusual."

The Supreme Court of Georgia, in the case of Continental Casualty Company v. Pittman, 145 Ga. 641, 89 S.E. 716, in construing a policy similar to the one in the instant case, held that the insured's death from sunstroke, which overcame him while performing his ordinary duties as fireman on a locomotive engine on a hot summer day, and nothing appearing to show that the sunstroke was due to "external, violent, and accidental means," within the meaning of those terms as used in the policy, was not within the coverage of the policy.

In addition to the foregoing, we might add many other authorities, supporting our holding in the cases of Northam v. Metropolitan Life Ins. Co., supra, and Inter-Ocean Casualty Co. v. Foster, supra, but we deem it wholly unnecessary. The holding in those cases is sound, and supported by the overwhelming weight of authority.

The evidence in the case at bar shows, without any sort of conflict, that the insured was performing his usual and customary duties, voluntarily assumed, in his usual and customary place, under usual and customary conditions, when he suffered the heatstroke, if in fact he did suffer such a stroke. There is not the slightest suggestion in the evidence, and no reasonable inference to be drawn therefrom, that the temperature of the building, the weather or other circumstances, external to the insured's own body, operated to produce the unanticipated injury, which was unknown or unforeseen by the insured. From aught appearing in the evidence, the temperature in the building was no greater than usual at that period of the year, and nothing occurred in the building, on the day the insured is claimed to have suffered the heatstroke, which created any change in the usual condition which obtained in the building.

The evidence wholly fails to support the averment of plaintiff's complaint, viz.: "That the insured's death was caused as the result, directly and independently of all other causes, of bodily injuries sustained through external, violent, and accidental means, while said policy was in force," and, therefore, the defendant was entitled to the general affirmative charge, and the court properly so instructed the jury, at defendant's request.

Let it here be said that the decisions in workmen's compensation cases may be left out of consideration. Under the statute, Code, § 7534 et seq., as amended, the employer is liable for injuries from accidents to employees arising out of and in the course of their employment. "The statute is concerned to afford protection against accidental results. In the sense of the statute, broadly speaking, the employment itself is the means of the accident and the employment, of course, is never accidental." Scott v. Metropolitan Life Ins. Co., supra; Ex parte Margaret L. Pow, Ala.Sup., 180 So. 288,[1] was dealing with an accident arising under our Workmen's Compensation Act, and not with an accident under an insurance policy, where the parties for themselves had stipulated that liability should arise only for an injury resulting from accidental external means. The statute is concerned "to afford protection against accidental results"; as pointed out in the Scott Case, supra, and the Pow Case, supra. The Pow Case is sound, and we adhere to it, and we are now dealing with a policy contract where the parties have stipulated that liability should accrue only for an injury resulting from an accidental external means.

Moreover, the policy contract in the instant case contains this provision, excluding liability: Provided, "5. That death shall not have been the result of self-destruction, whether sane or insane, *or*

[1] Post, p. 580.

a new trial where verdict of jury is so contrary to great weight of evidence as to warrant the conclusion that it is wrong or unjust as to shock the conscience of the court; that it is the result of inadvertence, forgetfulness or capricious disregard of testimony, of bias or prejudice, or is grossly excessive in amount awarded. Castleberry v. Morgan, 28 Ala.App. 70, 178 So. 823; Matthews & Morrow v. Batson, 218 Ala. 378, 118 So. 749; Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755; Sovereign Camp, W. O. W. v. Gunn, 229 Ala. 508, 158 So. 192. Under the Fair Labor Standards Act the fees for plaintiff's counsel are not a part of the liability for which plaintiff can recover, but is an allowance to be made by the court, after verdict and judgment. Hence, it is error to submit to the jury as a part of the liability in the case the matter of the fee for plaintiff's attorneys. 29 U.S.C.A. § 216(b).

H. H. Sullinger and Robt. W. Gwin, both of Bessemer, for appellee.

A night watchman, employed by an employer who is engaged in production of goods to be sold in interstate commerce, whose duties are to guard and watch his employer's premises, plant, machinery and goods, is an employe within the meaning of the Fair Labor Standards Act and is entitled to the benefits of the Act. Robinson & Co. v. Larue, Tenn.App., 156 S.W.2d 359; Id., Tenn., 156 S.W.2d 432; Fleming v. Pearson Hardwood Flooring Co., D.C. Tenn., 39 F.Supp. 300; Lefevers v. General Export Iron & Metal Co., D.C.Tex., 36 F.Supp. 838; Campbell v. Superior Decalcominia Co., D.C.Tex., 31 F.Supp. 663; Doyle v. Johnson Bros., 176 Misc. 656, 28 N.Y.S.2d 452; Johnson v. Phillips Buttorff Mfg. Co., 5 Wage & Hour Rep. 300; Milan v. Tex. Spring & W. Co., 5 Wage & Hour Rep. 71; Hargrave v. Mid. Cont. Pet. Corp., 5 Wage & Hour Rep. 275; McMillan & Wilson & Co., 5 Wage & Hour Rep. 192; Flores v. Baetjer, 4 Wage & Hour Rep. 471; Steger v. Beard & Stone Elec. Co., 4 Wage & Hour Rep. 411; Williams v. General Mills, D.C.Ohio, 39 F. Supp. 849; Hanson v. Queensboro Farm Prod., 5 Wage & Hour Rep. 255; Wood v. Central Sand & Gravel Co., D.C.Tenn., 33 F.Supp. 40. The affirmative charge should not be given if the evidence is directly or inferentially conflicting. Mann v. Butcher, 211 Ala. 669, 101 So. 595. Verdict of jury should not be set aside by trial court, or trial court reversed on appeal for failure to set aside unless the verdict is palpably erroneous. Cobb v. Malone, 92 Ala. 630, 9 So. 738.

Warner W. Gardner, Sol., and Mortimer B. Wolf, Asst. Sol., both of Washington, D. C., Wm. A. Lowe, Regional Atty., of Birmingham, and Henry A. Silver, Atty., for Administrator of Wage and Hour Division, U. S. Department of Labor of Washington, D. C., amicus curiae.

BOULDIN, Justice.

Action by employee against employer to recover balance alleged to be due for minimum wage, overtime pay, liquidated damages, and attorney's fee, under the provisions of Fair Labor Standards Act of 1938. 52 Stat. 1060, §§ 1 to 19, 29 U.S. C.A. §§ 201 to 219, inclusive. The employer, appellant, challenged the complaint by demurrer, on the ground that it presents no cause of action under said act.

The averments of the complaint pertinent to this inquiry appear in paragraphs 2 and 3, found in the report of the case.

The insistence is, in effect, that the complaint discloses plaintiff's employment was that of a night-watchman at the plant of his employer, who was engaged in the production of lumber and building materials for interstate commerce; and that such night-watchman is not engaged in the actual production of goods, nor in an "occupation necessary to the production thereof," within the meaning of section 3(j), 29 U.S.C.A. § 203(j). Since the Fair Labor Standards Act became effective, October 1, 1938, several courts, State and Federal, have construed the act as applied to "watchmen" or "night-watchmen," under varied states of fact.

On June 1, 1942, since briefs were filed in this appeal, the Supreme Court of the United States has dealt with the subject. Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638. In that case the owner of a building, known as a loft building, leased or rented same to sundry tenants who were engaged in the manufacture or production of goods for interstate commerce. The lessor, in keeping with his obligations to his tenants, had employees of different kinds, among them watchmen, of whom it was merely said: "The watchmen protect the buildings from fire and theft."

These watchmen, it will be noted, were not employees of the tenants actually pro-

ducing the goods for commerce, but one degree removed, namely, employees of the lessor of the buildings housing the manufacturing operations.

Following a general discussion of the power of Congress under the commerce clause, and the term "necessary," viewed in the light of the purposes of the act, the court concludes: "In our judgment, the work of the employees in these cases had such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce'. What was said about a related problem is not inappositive here: 'Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution such as "interstate commerce," "due process," "equal protection". In maintaining the balance of the constitutional grants and limitations, it is inevitable that we should define their applications in the gradual process of inclusion and exclusion. There is thus no point in the instant case in a demand for the drawing of a mathematical line. And what is reasonably clear in a particular application is not to be overborne by the simple and familiar dialectic of suggesting doubtful and extreme cases.' Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 467, 58 S.Ct. 656, 660, 82 L.Ed. 954. 'What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation.' Gully v. First Nat. Bank, 299 U.S. 109, 117, 57 S.Ct. 96, 100, 81 L.Ed. 70."

 This authority becomes the law of this court. Our task is to determine its application to the case in hand.

 Accordingly, we hold that a night-watchman, employed to perform, and engaged in performing, the duties of a night-watchman at a lumber manufacturing plant, producing and processing lumber for interstate commerce as alleged in the complaint, is an employee within the protection of the wage and hour provision of the Fair Labor Standards Act. The additional or incidental services mentioned in the complaint need not be considered separately or cumulatively as affecting the sufficiency of the complaint. The demurrer was overruled without error. It follows the affirmative charge was not due defendant on the legal proposition that a night-watchman is not within the coverage of the act. The same applies to other refused charges based on the same conception of the law. Plaintiff's evidence tended to show his employment as night-watchman and his engaging in such employment with incidental services as charged in the complaint; that for a time after his employment he was furnished and operated a night-watchman's clock, patrolled the grounds, carried a gun and flash-light, excluded intruders, protected the plant, which included a sawmill, log yard, planing mill and lumber-yard, from fire, theft or other injury.

Without further comment, we find the affirmative charge, based on a want of evidence to sustain the complaint, was properly refused.

Defendant denied that plaintiff was an employee at all, claimed he was only a pensioner, drawing a stipend without any duties as an employee, and performed no duties as a night-watchman with the knowledge and approval of the management.

This was the main issue of fact in the case, Defendant insists, if not due the affirmative charge on this issue, a new trial should have been granted on the ground that the verdict did not respond to the great weight of the evidence.

As a background for the inquiry, we think the following does clearly appear:

Plaintiff was a cripple all his life. He had been night-watchman at this plant for a great many years down to the time defendant took over in July, 1938. He continued in this service for defendant until early in September, 1938, living in a little house built for him on the premises by Mr. Crotwell, a former owner and operator of the plant. He was discharged about September 7, 1938, removed from the premises, and found lodging in an old shed on a neighboring lumber-yard. Mrs. Crotwell, the widow of his old employer, intervened in plaintiff's behalf. About October 24, 1938, plaintiff was permitted to return, given sleeping quarters in a back room of the office building until his old quarters were vacated by another occupant, then re-occupied same free of rent,

was paid the former sum of $8 per week, and provided water, fuel and lights. No deduction was made under unemployment compensation laws.

We think it clear, without substantial evidence to the contrary, that the superintendent, authorized to hire and fire for defendant, did advise plaintiff at the time that his stipend should be known as a pension, that plaintiff acquiesced in this, spoke of it as a pension to others; that the records were kept accordingly, his name not appearing on the pay-roll, but actually paid at the same time and place as pay-roll employees.

But that plaintiff was to perform no duties as night-watchman was controverted by substantial evidence.

The direct testimony of plaintiff that it was expressly stipulated his duties were to be the same as theretofore, and he did so perform, with the knowledge of the management, was corroborated by testimony of other witnesses.

The evidence was in sharp conflict on this issue. To review it in detail would serve no good purpose.

Indulging the well known presumptions in favor of the verdict of the jury, sustained by the trial judge, we are not convinced the finding of the jury was clearly and palpably wrong and unjust.

Plaintiff filed interrogatories to defendant. Before offering the answers in evidence, plaintiff moved to strike a portion of the answer to Interrogatory 25. The interrogatory, answer, and portion stricken, appear in the report of the case.

We are of opinion the portion stricken was responsive to the broad language of the interrogatory; was a permissible explanation of the occasion and conditions under which plaintiff returned, and should not have been stricken.

We cannot say that injury resulted from this ruling. All the facts touching the same matter were deposed to by the parties having knowledge of same, the parties required by law to answer the interrogatories. Mrs. Crotwell had died before the trial. This answer was not her answer. We find no reversible error here.

A reasonable attorney's fee was claimed in the complaint. Evidence was offered touching the amount of a reasonable attorney's fee, and the jury found same as a separate item in the verdict returned. The statute, § 216, provides: "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

Appellant would construe this statute to mean that the jury shall find by their verdict the amount recoverable under other provisions of the act, make no finding as to attorney's fee, and the trial judge, by further proceeding, shall ascertain and fix the attorney's fee to be added as part of the final judgment.

We do not so construe the act. It does not appear the act intends to prescribe other and different procedure in this regard, than obtains in the jurisdiction trying the cause. The "court" as used in the act may as readily be held to mean the court having jurisdiction of the cause, as to mean the trial judge.

We do think it fitting that the amount of the fee shall be found as a special item in the verdict. This, because, the trial judge has greater discretion and duty by reason of special knowledge, in dealing with the finding of the jury on this issue, than in dealing with jury findings on other issues. We find no reversible error in the record.

Affirmed.

GARDNER, C. J., and FOSTER and LIVINGSTON, JJ., concur.