115 So.2d 911

**UNITED SECURITY LIFE INSURANCE COMPANY**

v.

**Florence CLARK.**

**6 Div. 667.**

Court of Appeals of Alabama.

Nov. 24, 1959.

Rehearing Denied Jan. 12, 1960.

S. P. Keith, Jr., Birmingham, for appellant.

Brobston, Jones & Brobston and W. E. Brobston, Bessemer, for appellee.

PRICE, Judge.

This action was brought by the appellee, wife of the insured, upon a policy of insurance which obligates the Company to pay the beneficiary One Thousand Dollars, "If the insured sustains * * * bodily injury effected solely through violent, external and accidental means * * *."

Among the conditions of the policy, upon which it issued, are the following:

"This policy does not cover death caused

"(1) from homicide or self destruction, while sane or insane.

"(2) from participation in an assault or felony."

The pleading was in short by consent the general issue, with leave to give in evidence any matter which, if well pleaded, would be admissible, with like leave on the part of plaintiff.

Appellant's counsel states in brief:

"The defenses which were relied upon by appellant were the general issue and the plea of satisfaction in that plaintiff had surrendered her policy of insurance and accepted a return of premiums, a plea that appellant had failed to make due proof of loss and a defense under the provisions of the policy relating to homicide, that the ap-

pellant's husband who was the insured under the policy was killed intentionally and as a result of a homicide at the hands of a negro who was convicted in the Circuit Court at Bessemer, Alabama, for murder in the first degree."

Counsel for appellant contends that the lower court erred in refusing appellant's request for charges affirmative in nature and in denying appellant's motion for a new trial because of the insufficiency of the evidence to support the judgment.

It is without dispute in the evidence that the insured, James B. Clark, who was a police officer of Lipscomb, Alabama, died as the result of a wound inflicted by his own pistol, on the night of July 12, 1957. It is plaintiff's theory that when shot the officer was attempting to arrest a Negro man named Caliph Washington.

The plaintiff's evidence tended to show she was the widow of James B. Clark, and the beneficiary in the policy of insurance issued on his life by United Security Life Insurance Company; that about a week after her husband's death she took the policy to the company's office in Birmingham where she talked to two men and was told the company would not pay the claim. She was asked to leave the policy, which she did, and was given a check for $2.40, as refund of premiums. She was told she should go home and sue the City of Lipscomb. Plaintiff introduced the policy in evidence.

J. W. Thompson, Coroner for the Bessemer Division of Jefferson County, testified he received a call at approximately 2:00 a. m., on July 12, 1957, after which he went to the Bessemer General Hospital and saw insured's body. He was present when an autopsy was performed by Dr. L. H. Kwong, a pathologist in Dr. Casey's office. Dr. Casey was not present during the autopsy. From his previous experience and from his observation of the autopsy witness would say Mr. Clark's death resulted from a gunshot wound. There was one such

wound on the body. The bullet grazed the left arm and penetrated the chest. There was a burn on the arm and on the officer's shirt. The bullet traveled a downward path at a forty-five degree angle. Caliph Washington was five-seven or five-eight in height and Mr. Clark was five-ten or eleven. The bullet was recovered from the second lumbar vertebra. It went through the Aorta of the heart. From the sizes of the men, the place of the wound and the course of the bullet, he could not say that it was physically impossible for Mr. Clark to have been shot in a struggle over the gun, and it was the contention of the defense in the criminal case that this was what happened. The coroner stated further that he made a thorough investigation into the facts and circumstances surrounding Mr. Clark's death. Dr. Kwong did not participate in that investigation. It could not be determined from the autopsy whether the officer died as a result of homicide.

By agreement the testimony of Caliph Washington, the defendant, and that of three of the state's witnesses in the trial on the criminal charge, was introduced in evidence by the plaintiff.

The testimony given by these witnesses in the criminal case, as shown by the record, was as follows:

Mr. Thompson, the Coroner, testified to substantially the same facts as he did in the present case.

Mr. Avery testified he was Chief of Police of Lipscomb. On the night of Mr. Clark's death they were working together on a whiskey transportation case, between the Bessemer City limits and Lipscomb. He identified the gun introduced by the state as one belonging to Officer Clark and stated it was the gun he had the night he was killed. Mr. Clark was driving a police car with a siren and a revolving dome light. He testified he found a dent on the inside of the right rear fender, which was caused on the night of the killing.

Mr. Warren testified he was a highway patrolman for the State of Mississippi. On

July 14, 1957, he arrested Caliph Washington at Byhalia, Mississippi, on U. S. 78, a route going to Memphis. At the time of his arrest Caliph Washington had in his possession a paper shopping bag containing a pistol, identified as Officer Clark's pistol, and which was introduced in evidence.

Caliph Washington testified he was seventeen years of age. On the night of the shooting he was driving a 1950 Chevrolet. After he had driven some people around and had taken them home he noticed a car driving behind him as he reached Dartmouth Avenue in Bessemer. Some one fired at him twice and he speeded up and drove up Dartmouth and turned onto 16th street. The car was still following and he drove down Exeter Avenue and turned off on Short 15th, went up Fairfax and turned into Exeter Alley. He heard no siren, no command to halt, and never saw a flashing light on top of the car until he got into the alley. When he saw the light he stopped and waited in his car until the officer came around, opened the door and told him to get out and put up his hands. He got out of car, put up his hands, and the officer asked him about whiskey. He had no whiskey or weapons of any sort. The officer took him around to the side of the car and started to strike him with his pistol but witness grabbed his hand. They started tussling and the gun fired fast two or three times. While they were struggling for the gun the car door got between them, the officer on one side and witness on the other. Witness never obtained control of the pistol and did not pull the trigger. The gun went off while it was in the officer's hands. After the third shot was fired, the officer released his hold on the gun and fell. The witness ran, taking the gun with him.

Defendant introduced in evidence (1) a certificate headed "Jefferson County Board of Health; Bureau of Records and Vital Statistics; Birmingham, Alabama, Certificate of Death, State of Alabama," signed in the name of the health officer by "Geo. V. Truss, Registrar of Vital Statistics." The certificate contains what purports to be a medical certificate signed by Drs. A. E. Casey and L. H. Kwong. The answer to the inquiry as to disease or condition directly leading to death is shown to be "Gunshot wound, abdomen," and in answer to whether it was an "Accident (specify, Suicide, Homicide)," stated "Homicide." (2) The coroner's verdict showing cause of death to be "an unlawful homicide." (3) The record of the conviction of Caliph Washington upon a charge of murder in the first degree for the killing of James B. Clark, with the imposition of a sentence to death by electrocution.

■ We cannot agree with appellant's contention that it was due the general affirmative charge upon the theory that the evidence shows plaintiff had surrendered her policy and voluntarily accepted the return of premium in satisfaction of her claim, and for plaintiff's failure to prove notice to defendant as required by the terms of the policy.

In American Life Ins. Co. v. Williams, 234 Ala. 469, 175 So. 554, 556, 112 A.L.R. 1215, it was held that claim for the full amount of a life insurance policy was not discharged by the acceptance of premiums, tendered under the terms of the policy on the theory that insured died from a pulmonary disease. "So that plaintiff was not precluded from her claim now made that insured did not die from a pulmonary disease, because of the alleged accord and satisfaction, whether it was procured by fraud or not. It was not based on sufficient consideration."

■ It is well established that denial of liability by the insurer on some ground other than failure to furnish proof of loss, is a waiver of the necessity to furnish proof of loss. See Ala.Dig., Insurance, ⌾559(2) for numerous cases.

Appellant further insists it was due the general affirmative charge for failure of proof that insured's death was accidental

within the terms of the policy. It is argued in brief that insured "subjected himself to a deadly encounter and voluntarily put his life at stake and deliberately took a chance of getting killed, therefore the act which caused his death could not be considered accidental," citing and relying on Prudential Casualty Co. v. Curry, 10 Ala.App. 642, 65 So. 852, 854, where it was held that the trial court erred in rendering judgment for the plaintiff on a policy insuring against death from accidental means, the court saying that the conduct of insured could "be regarded in no other light than an invitation to a deadly encounter, in which the deceased voluntarily put his life at stake, and deliberately took the chances of getting killed."

It is appellee's contention that under the evidence insured was not the aggressor in a personal difficulty with Caliph Washington, but that he was an officer making an arrest in the discharge of his duties and was accidentally killed in a struggle for possession of his own weapon which was discharged in the struggle.

In O'Bar v. Southern Life & Health Ins. Co., 232 Ala. 459, 168 So. 580, 582, the court said:

"The rule is that when insured is the aggressor, especially with a deadly weapon, and makes such an attack on another as would naturally invite a deadly encounter in resistance of his attack, and as the probable consequence of it, and he is killed by the other while so resisting him, it cannot be regarded as an accidental death, since he voluntarily put his life at stake and deliberately took the chances of getting killed."

In 45 C.J.S. Insurance § 788, p. 827, this statement is made:

"If insured is innocent of aggression or wrongdoing, and is killed or injured in an encounter with another, his death or injury is accidental, or is caused by accidental means, within the policy, as where he is injured while defending himself against an unprovoked assault; and even though he is the aggressor, if he could not reasonably anticipate that his acts or course of action would result in death or bodily injury at the hands of his antagonist, insurer may be held liable."

See also, Travelers' Ins. Co. v. Dupree, 17 Ala.App. 131, 82 So. 579.

It is further insisted that the evidence conclusively establishes that insured's death "was caused by a homicide for an intentional killing or from participating in an assault, therefore appellant is not liable under the policy for an accidental death."

In American Life Ins. Co. v. Morris, 37 Ala.App. 438, 72 So.2d 414, 415, certiorari denied 260 Ala. 693, 72 So.2d 418, we considered a death caused "from participation in an assault" clause in a policy. In that case Presiding Judge Carr quoted with approval the general rule as stated in 29 Am.Jur., Insurance, Sec. 981, p. 738:

"Moreover, it has been held that the aggression or assault on the part of the insured which will relieve the insurer from liability under its policy must be such as would justify the person assaulted, acting as a reasonably prudent person, in injuring or taking the life of the insured."

Many decisions from other jurisdictions supporting this general rule were cited in the Morris case, as well as the case of Eminent Household of Columbian Woodmen v. Payne, 18 Ala.App. 23, 88 So. 454, in which this court construed a provision in a policy that there should be no liability if the insured died as the result of a combat, to mean a combat in which he was at fault.

The courts of other states have held that the word homicide, in a provision of an insurance policy excluding death by homicide, is ordinarily used in the sense of intentional homicide, that is, a felonious killing. See Lloyd v. Unity Life Ins. Co., 225 La. 585, 73 So.2d 470 and cases there

cited. See also Great Southern Life Ins. Co. v. Campbell, 148 Miss. 173, 114 So. 262, 56 A.L.R. 681; Day v. Interstate Life & Accident Co., 163 Tenn. 190, 42 S.W. 2d 208.

The coroner's certificate and the certificate purporting to set out a copy of the doctor's certificate showing cause of death as homicide are not conclusive evidence against the beneficiary. Death certificates are by statute made only prima facie or presumptive evidence of the facts therein stated. Code 1940, Title 7, Sec. 386, and Title 22, Sec. 42. See also Sorrow v. Industrial Life & Health Ins. Co., 259 Ala. 544, 68 So.2d 43; Jefferson Standard Life Ins. Co. v. Wigley, 248 Ala. 676, 29 So. 2d 218; Pacific Mutual Life Ins. Co. v. Yeldell, 36 Ala.App. 652, 62 So.2d 805.

A judgment of conviction of a beneficiary for murdering the insured when offered in civil proceedings is not conclusive against the beneficiary, but is merely prima facie evidence of guilt. Sovereign Camp, W. O. W. v. Gunn, 227 Ala. 400, 150 So. 491; Sovereign Camp, W. O. W. v. Gunn, 229 Ala. 508, 158 So. 192. See also, Fidelity-Phenix Fire Ins. Co. of New York v. Murphy, 231 Ala. 680, 166 So. 604, holding the record of conviction of the owner of certain property of conspiring to defraud the insurance carrier by the wilful destruction of the property covered by the policy, admissible as prima facie evidence against the owner in an action on the policy.

In Thompson v. United States, 9 Cir., 80 F.2d 663, 664, it is pointed out that in cases holding such judgments admissible as prima facie evidence of guilt in civil cases, citing among others, Sovereign Camp, W. O. W. v. Gunn, 227 Ala. 400, 150 So. 491, supra, "It will be observed, the party against whom the judgment was offered was a party to the judgment."

In Bibbs v. Fidelity Health & Accident Co., Mo.App., 71 S.W.2d 764, 765, a suit by the administrator of the estate of Genevieve Bibbs, deceased, upon a policy of insurance providing for benefits "in event her death was caused directly and independently of all other causes through external, violent, and accidental means," and providing further, "The insurance under this policy shall not cover * * * injuries intentionally inflicted upon the insured by any person other than herself * * *," the court said: "The defendant, over the objections of plaintiff, introduced the record of conviction of William C. Moffett upon a charge of having intentionally killed Genevieve Bibbs. The estate of the deceased was not a party to the prosecution, and was not affected by the result thereof. It was improper to receive this evidence." We are of course not here concerned as to the admissibility of the judgment of conviction, but only as to its effect as evidence.

In O'Bar v. Southern Life & Health Ins. Co., 232 Ala. 459, 168 So. 580, 581, the court said:

"Insured was killed in an affray, and defendant's counsel made reference to the fact that the party who killed him had been acquitted of a criminal charge on that account. The issue, as we will show, is whether insured brought about his own death. On that issue, the fact that the party who killed him was acquitted of a criminal charge is quite different from evidence that insured had himself been convicted of a charge which, if true, showed a condition not in the coverage. Sovereign Camp, W. O. W. v. Gunn, 227 Ala. 400, 150 So. 491; Fidelity-Phenix Fire Ins. Co. [of New York] v. Murphy, 226 Ala. 226; 146 So. 387.

"The beneficiary of the policy, the insured being dead, is so far removed from the trial of the criminal case against his slayer as that the result of his trial can have no bearing on this suit."

See also Moorman v. National Casualty Co., Ohio App., 75 N.E.2d 806.

■ The judgment of conviction of Caliph Washington in the criminal case could have no binding effect against the beneficiary on the issue of whether the killing was intentional within the policy provision exempting insurer from liability for death caused by homicide.

It was for the jury to determine from all the facts and circumstances whether the plaintiff was entitled to a recovery under the policy. There was no error in the court's refusal to give the requested general affirmative charge. American Life Ins. Co. v. Morris, supra.

■ The evidence, if believed to the required degree, was sufficient to justify the verdict. There was no error in the denial of the motion for a new trial on the ground the verdict was contrary to the preponderance of the evidence. American Life Ins. Co. v. Morris, supra; Cobb v. Malone, 92 Ala. 630, 9 So. 738; Kurn v. Counts, 247 Ala. 129, 22 So.2d 725.

Affirmed.

CATES, Judge.

I concur in the judgment and in all of what Judge PRICE has so well and thoroughly treated.

A note of caution seems needed lest this case rise in a different form to haunt us.

How Clark died was a question of fact and the judgment in the murder trial did not make it one of law.[1] The death certificate, when saying death was due to "homicide," showed only an opinion probably extending beyond the bounds of expert testimony. Cf. Hawkins v. State, 267 Ala. 518, 103 So.2d 158 (lunacy commission report not conclusive).

Two juries viewing the same transaction can come to opposite results. Charles P. Curtis, The Trial Judge and the Jury, 5 Vand.L.R. 150, says:

"* * * Juries relieve the judge of the embarrassment of making the necessary exceptions. They do this, it is true, by violating their oaths, but this, I think, is better than tempting the judge to violate his oath of office. Thus the law may ignore necessary exceptions to its necessarily strict rules, much as a miracle allows the order of nature to proceed on its orderly way, indifferent and unaffected, intent on the next event.

"* * * Practically, and ignoring pretensions to logic, there are exceptions, and the law looks to the jury to make them, because it does not feel able to make intelligible rules to cover them; nor does it want to admit that the law is less than a complete system.

\*     \*     \*     \*     \*     \*

"* * * When the general terms of the law are too far removed for the lawyer-like mind to mediate between them and the immediate occasion, the law, like Pilate, and equally wisely, washes its hands and asks the jury to see to it.

\*     \*     \*     \*     \*     \*

"Finally, the law refuses to let the jury give any reason for its decision. Lord Goddard, the Lord Chief Justice who presided in Harold Laski's libel suit against the newspapers in 1945, put it this way when he charged the jury. 'Another incalculable advantage of trial by jury is this: whereas, if a judge tries a case, he has to give the full reasons on which he bases his judgment, a jury are in a more fortunate position, that they cannot be cross examined or asked to give their reasons; they simply return their verdict one way or another, say what they find and they do not give their reasons.'"

While we formally do lip service to the notion that the law exists for every set of

---

[1]. On appeal Washington's conviction was set aside. Washington v. State, Ala., 112 So. 2d 179.

facts, yet we are aware that juries, in applying general rules (and their exceptions) in detail, often act as a twelve-man law-making body. Thus, Mr. Curtis, citing the amorphous law of Athens which had all jury and no judge in its courts, concludes:

"The law calls in a jury not only when it lacks confidence in its judges, but when the law lacks confidence in itself. * * *

*   *   *   *   *   *

"* * * There is nothing in the constitution which prevents us from putting the more rational of us on our juries, nor from judging this quality by the rule of thumb of success. And yet are we so sure that the more rational a citizen is the better he fulfills the irrational and intuitive element in our law, without which a court would be incomplete, only part of a man, sitting in judgment upon whole men?"