RATHMAN *v.* NEW AMSTERDAM CASUALTY CO.

1. INSURANCE—FRAUD—ACCIDENT POLICY—DEATH.

In an action for the death by accident of an insured who jumped overboard from a ship on which he was crossing the ocean, proof that a statement in the application of the insured that he had made no claim or received indemnity for any accident or disease and that in fact he had received thirty dollars from another insurance corporation for injury to one of his knees, was not such a fraudulent and material representation as to warrant a forfeiture of the policy covering the accidental death of the insured.

2. SAME—WARRANTIES—ACCIDENT INSURANCE.

A representation in an application for accident insurance that plaintiff had not been disabled or received medical attention during the past five years, attached to and made a part of the policy, was an affirmative warranty which was material and its falsity amounted to such fraud as to vitiate the contract.

3. SAME — ACCIDENTAL DEATH — SUICIDE — DISEASE — PROXIMATE CAUSE.

Proof that deceased had been subject to an illness and had been treated by various physicians and was returning from Europe where he had been treated for the restoration of his health, that his health, strength and judgment were impaired and during the voyage he had been confined to his stateroom troubled by his heart and bad breathing, and that his mind was unbalanced, that he was suffering from a disease diagnosed by physicians as chronic nephritis, complicated by other physical ailments, justified the conclusion that deceased in jumping overboard was affected by the disease and that the proximate cause of his death was not an accident within the meaning of the policy.[1]

Error to Kent; Brown, J. Submitted January 21, 1915. (Docket No. 36.) Decided June 7, 1915.

[1]As to liability under accident policy for death during delirium, see 46 L. R. A. (N. S.) 543.

Assumpsit by Lydia Rathman against the New Amsterdam Casualty Company on a policy of accident insurance. Judgment for plaintiff. Defendant brings error. Reversed.

*Kleinhans, Knappen & Uhl,* for appellant.

*Holmes & Holmes* and *Don E. Minor* (*Myron H. Walker,* of counsel), for appellee.

STEERE, J. This action was brought by plaintiff as the beneficiary named in an accident insurance policy issued by defendant to her husband, Paul Rathman, who, on the evening of July 10, 1912, lost his life by falling or jumping overboard from the steamer Kaiser Wilhelm II, while en route between Bremen and New York. No question is raised as to the pleadings. Her declaration is in assumpsit, upon the policy of insurance according to prescribed form. Defendant's plea is the general issue, with special notices which raise the question of whether death of the assured, if proven, was accidental, or caused, or contributed to, by disease, illness, or suicide, with the affirmative defense that breaches of warranties in deceased's application for insurance indorsed upon the policy and made part of the contract of insurance rendered the same void. A trial of said cause in the circuit court of Kent county before a jury resulted in her recovering a verdict and judgment for the full amount which could be claimed under the policy, and, after motion for a new trial which was refused, defendant removed the case to this court for review upon a writ of error containing many assignments.

Defendant's main contention is directed against refusal of the court to direct a verdict against plaintiff in the first instance, followed by denial of its motion for a new trial; it being urged and argued that there was in the case no evidence to support the verdict,

which was contrary to and against the great weight of evidence, because it was not shown death of the insured was accidental, while the evidence disclosed that the accident, if any, was caused or contributed to by disease, and there were material breaches of the warranties contained in the schedules indorsed on the policy.

In outline, it was disclosed by the evidence that on March 16, 1910, the date of the policy in question, deceased, at the solicitation of one La Bare, who was defendant's general agent for the State of Michigan, made application for accident insurance; that upon such application La Bare countersigned, as special agent, and delivered to him the policy in question, at the city of Grand Rapids in the State of Michigan, where both resided; that the application signed by deceased was forwarded to the home office of the company and there approved. Statements made by defendant in said application were copied upon said policy, and upon renewals thereof made in 1911-12, and were by express terms made a part of the same. By the terms of his application assured warranted all statements contained in it to be true, in the following language:

"(14) This agreement is made in consideration of the premiums and of the statements contained in the said schedule indorsed hereon and made a part hereof, which statement the assured makes on acceptance of this policy and warrants to be true, and this policy and schedule contain the entire contract except as the same may be affected by any table of rates and classification of risks filed by the company with the insurance department of the State wherein the policy is issued or delivered."

The policy was for $3,000, and provided for payment of the full sum in case of loss of life, indemnities to be doubled if the loss was sustained by assured riding as a passenger in a public conveyance, with a

further provision for increased indemnity if the policy was renewed continuously.

The provisions as to loss of life, and notice of any loss, are as follows:

"Loss of life shall be deemed to mean death of the assured from bodily injuries, not intentionally self-inflicted, which independently of all other causes are effected solely and exclusively by accidental means, resulting in 90 days of the event causing such bodily injuries, or resulting during a period of total disability as herein defined and within 200 weeks of the event causing such bodily injuries as aforesaid."

"Written notice of any loss for which claim is to be made, with full particulars thereof, must be given to the company at its home office in New York City by the assured, the beneficiary or legal representative, within 20 days from the event causing the injury, unless such notice shall be shown not to have been reasonably possible. Affirmative proof of death or of loss of hand or foot or of sight or of duration of any disability, must also be furnished to the company at its home office in New York City within 60 days of the time of death, or of loss of hand or foot or of sight or of the termination of disability. The company agrees to pay the indemnity due hereunder within 60 days after receipt at the home office of the company of due proof of such claim."

The policy expressly provided that the insurer should not be liable for any loss caused or contributed to by suicide, illness, or disease, or by disappearance, whether assured be sane or insane.

By their terms the renewal certificates issued to deceased expressly stated that the insurance was continued in force subject to all such conditions and warranties, both written and printed, whether indorsed upon the policy or attached thereto, provided the statements and warranties contained in such policy indorsed thereon or attached thereto remained and

were true at the date of issuing the renewal certificates and nothing had occurred, known to assured, rendering the hazard greater or different than originally represented.

Upon her return to Grand Rapids, plaintiff notified La Bare, defendant's special agent, of the time and manner of her husband's death and through him presented to the company proofs of loss. Payment was refused on the grounds before referred to, and also because notice was not given nor proofs of loss furnished according to the terms of the policy.

The statements in insured's application which defendant claims were false are as follows:

"Statement 14. I have never made claim nor received indemnity for any accident, disease or illness, except as follows: No exceptions."

"Statement 16. My habits of life are correct and temperate; my hearing and vision are unimpaired; I have never been afflicted with hernia, articular rheumatism, cataract, any disease of the eye, nor insanity, and I am in sound condition mentally and physically, except as follows: No exceptions.

"Statement 17. I have not been disabled nor have I received medical or surgical attention during the past 5 years, except as follows: No exceptions."

In support of its claim that said statement 14 was untrue, defendant points out the following in plaintiff's affidavit, as beneficiary, making proofs of loss:

"Had deceased ever received indemnity from a life, health, benefit or accident insurance company, association or order? (A) $30 from Travelers of Hartford, Conn. Injury to knee."

When and under what circumstances this was paid is not shown. La Bare, defendant's general agent, who assisted plaintiff with her proofs of loss, testified that deceased carried with him a policy in the Travelers for several years. Plaintiff testified her husband did not tell her about his business affairs and she had

no knowledge of the collection of $30 as stated. Manifestly the fact alleged to have been misrepresented has no relation to the cause of death. Under the circumstances of this case, it cannot be said as a matter of law that this amounted to a material and prejudicial misrepresentation which necessarily worked a forfeiture of the policy. At most, it became a matter for the jury. *Hann* v. *National Union*, 97 Mich. 513 (56 N. W. 834, 37 Am. St. Rep. 365). The answers to statements 16 and 17 are more directly related to the cause of loss and involve more serious consideration.

It is shown both by plaintiff's testimony and proofs of loss that deceased had experienced ill health and received medical attention at times for several years before his death, although the testimony wavers somewhat as to the nature and extent of his troubles. He was an old resident of Grand Rapids, 65 years of age, an officer of the Grand Rapids Brewery Company, in charge of its bottling department, and had been one of its directors for over 20 years. His health had been such that in 1910 he visited Europe and took baths at Bad-Neuheim, Germany, from which he was benefited. When abroad he was treated by, and consulted with, two physicians, Dr. Pappe, of Baden Neuheim, and Dr. (Professor) Mattias, of Cologne and Marburg. In December, 1911, at his home in Grand Rapids, he suffered a severe illness, accompanied by profuse bleeding at the nose, and, when Dr. Hutchinson, his physician, was called, was excessively weak, breathing with difficulty and his radial pulse gone. He revived, under the doctor's treatment, from this attack, and his general condition improved for a time. In his certificate, which was part of plaintiff's proofs of loss, the doctor certifies as follows:

"October 12, 1912. This is to certify that I have treated Mr. Paul Rathman, deceased, more or less for

the past four or five years and quite constantly during the last year of his life.

"His illness was of such a nature that at times he had great difficulty in breathing; during this time more or less stupor prevailed; during these attacks there were periods of mental aberration, during which time he was certainly irresponsible.

"R. J. HUTCHINSON, M. D."

Upon the trial Dr. Hutchinson testified that prior to the serious illness of 1911 he had not visited deceased professionally at his home, but had treated him at different times for four or five years as he would "any other person with some minor ailment;" that insured recovered from the serious attack referred to and later made visits to the doctor's office, became better again, and his general condition improved; that he was, however, weak—not well—and during the spring the doctor gave him a tonic to build him up, but did not think he ever fully recovered. The doctor appears to refrain from naming his patient's ailments, whether minor or major, and seemed reluctant to admit on cross-examination that he had not fully recovered.

On April 27, 1912, deceased, accompanied by his wife, started for Europe, going to Bad-Neuheim, where he again took baths. While abroad he became better at times and traveled some, but finally, while at Berlin, his condition became serious, and a physician was called to attend him. On July 8th he started, accompanied by plaintiff, for Bremen to take ship for home. During his stay in Europe he was again treated by Dr. Mattias, at Marburg, where he remained for two weeks, returning to Neuheim again for baths. The physician who attended him in Berlin accompanied and cared for him until on board the boat at Bremen. His condition had then become such that it was necessary to carry him and he was moved in an ambulance. On board the boat he was out of

his head part of the time—for about three hours the first night — had difficulty in breathing, his heart bothered him, and he was at times propped up in bed in his stateroom where he remained, not being out of his berth except for temporary necessities. He was rational at times and at times out of his head, said little, but manifested an anxiety to get home. They occupied an outside stateroom which opened upon a short passageway leading out to the open deck, around which was a railing. On the evening of July 10th, at about 10:05 o'clock, assured disappeared overboard, under the following circumstances as stated by plaintiff in her proofs of loss and confirmed by her testimony at the trial:

"While lying in my berth, I heard the door of our cabin close, and I immediately followed him to the deck (he was clad in his nightshirt) just in time to grab his hand, his body being on outside of railing, and the next thing I heard was a splash in the water. We were returning home from Europe, left Bremen July 9, 1912."

She testified that at the time she caught him he was over the railing, holding by his hand which she seized, but was torn from her before the steward, who came running when she screamed, could reach her; that the night was foggy and the sea then rough.

Plaintiff testified, "No physician that we ever consulted ever made any statement as to what Mr. Rathman's trouble was," although the following appears in her affidavit in proofs of loss:

"What diseases or ailments did the deceased have on or about July 10, 1912?

"A. Specialists claimed he had kidney trouble."

Dr. (or Professor) Max Mattias, who made an affidavit for her proofs of loss as "attending physician," stated in said affidavit that he was director of the Medical University clinic at Marburg; that he ex-

amined deceased in private clinic at Cologne in 1910 and at Marburg in 1912; treated him in May, June, and July, 1912; that he found him afflicted with chronic nephritis, uremia, arterio-sclerosis, and hypertrophy of the heart; that the duration of his last illness was "several years," the predisposing cause being arterio-sclerosis. Dr. Vandenburg, of Grand Rapids, testified as an expert that chronic nephritis is of long duration, always a few years and, as a rule, many years; that "it takes a long time to get a hypertrophied heart;" that in some forms and stages of nephritis albumen is not found in the urine, while Dr. Hutchinson testified that nephritis could not exist without showing albumen in the urine; that he made careful examination of assured in December, 1911, and found no trouble with the urine; that there is no way of telling, from an examination, how long standing nephritis may have been, and "it would be guesswork how long that attack had lasted." These matters upon which the testimony is in conflict would, of course, present questions for a jury if controlling; but, aside from this somewhat conflicting evidence of experts at the trial, the undisputed evidence produced by plaintiff shows that before, and at the time, assured was taken on board the ship, he was very ill, in a serious condition requiring that he be moved in an ambulance, his heart troubling him and breathing with difficulty, his mind affected—"out of his head" at times—confined to his stateroom and bed on board the boat, stricken with nephritis and its complications, the same disease with which the expert whom he consulted on both his trips to Europe found him afflicted, in a chronic condition, two years previous.

This is purely an accident policy, covering loss of life "from bodily injuries, not intentionally self-inflicted, which independently of all other causes are

effected solely and exclusively by accidental means," and it is further plainly provided in the contract of insurance that the insurer shall not "be liable for any loss caused or contributed to by illness or disease or disappearance or by suicide, whether the assured be sane or insane." These provisions applied to the facts leading up to and surrounding the assured's death present the most meritorious and serious questions arising in the case.

Incidental to and bearing directly upon this feature is the statement, made a part of the policy of the insured, warranted to be true, and reaffirmed by accepting a renewal certificate in March, 1912, that he had not been disabled nor received medical or surgical attention during the past five years. The materiality of the statement is obvious in this case. That such statements in assured's application, when attached to and made part of the policy, are affirmative warranties in the contract, in accident as well as life insurance, is well settled. 1 May on Insurance (4th Ed.), §§ 158, 159; *Bonewell* v. *Insurance Co.*, 167 Mich. 274 (132 N. W. 1067; Am. & Eng. Ann. Cas. 1913A, 847):

It must be conceded as largely conjectural whether assured's death was accidental or intentional and suicidal. There are evidential facts in the case persuasive of the latter view, while the legal presumptions against self-destruction are in favor of the former. Conceding, however, that it was accidental, plaintiff cannot recover if the accident was caused or contributed to by illness or disease. The trial court so held, but adopted the view that this was an issue of fact for the jury.

The burden of proof was upon the plaintiff to prove accidental death within the terms of the policy. The question of remote and proximate cause as applied in negligence cases is not controlling under the provisions

of this contract of insurance. It may be said that the proximate cause of death was falling from the ship into the ocean and drowning; but if there was a causal relation between the concededly serious illness with which the insured was then suffering and the fatal event, even if accidental, there can be no recovery.

The attending facts and circumstances of assured's death, and events leading up to it, are established by plaintiff's proofs and undisputed. There was no question as to the proximate cause of death and positive proof of debilitating disease, apparently to a point of helplessness, which seriously impaired both his natural strength and judgment, and the free, full, and normal exercise of his faculties in protecting himself from harm or accident, particularly when in a strange place, on shipboard, traveling by sea. While so traveling, he had been by his illness confined to his stateroom and berth—feeble, distressed in breathing, his heart troubling him, and his mind unbalanced at times. He had then been confined to his bed most of the time for "about twenty days" with disease of the kidneys designated by his physicians "chronic nephritis," complicated by enlargement of the heart and uremia, a condition resulting from retention in the blood of waste products of the system which would normally be eliminated by the kidneys. About 10 o'clock of the second night out, which was rough, dark, foggy, and very damp, just after plaintiff had lain down and closed her eyes, he arose from his berth and slipped out upon deck, followed immediately by plaintiff, who heard him close the door, and when she overtook him he was outside the deck railing, and as she seized his hand it was torn from her, and "there was a splash in the water" as he disappeared. The facts are undisputed, and the conclusion is unavoidable that this catastrophe, whether intentional or not, had causal connection with, and was attributable in

whole or in part to, his illness and the disease which so impaired both his normal mental and physical ability to guard himself against accidents.

In the case of *Carr* v. *Insurance Co.*, 100 Mo. App. 602 (75 S. W. 180), plaintiff, while ill of la grippe in a hospital, suffering with a high fever and delirious, escaped from his nurse, who had left him for a few moments, and, jumping out of a window, fell a distance of 20 feet, receiving serious injuries. He brought action against defendant on an accident policy issued by it to him which by its terms did not cover or insure against "injuries, fatal or otherwise, received while or in consequence of being or having been under the influence of or affected by, or resulting directly or indirectly, in whole or in part, from intoxicants, anæsthetics, etc., * * * or any disease or bodily infirmity, * * * " etc. In deciding that under this policy, as applied to the undisputed facts, there should have been a directed verdict for defendant, the court said in part:

"We can appreciate the theory that if the individual is sick, and that he merely suffers from an accident which happens to him while sick, but is not brought about as a result of such sickness, the sickness is neither the proximate nor remote cause of his injury. * * * But the question presented under the terms of the policy is not whether the plaintiff's sickness was the pioximate and immediate cause of his injury, but whether the injury was directly or indirectly caused by his disease. * * * For the reasons given, we are of the opinion that plaintiff's injury was the direct result of his sickness; and whether it was or was not is immaterial, for it cannot be denied that it was not at least the indirect result of his condition. In either event the defendant would not be liable under the terms of the policy."

We are impelled to conclude it affirmatively appears from the undisputed evidence in this case that the assured's death was not occasioned by an accident

independent of all other causes, but was contributed to by, and the result of, the illness or disease with which he was afflicted.

The judgment is therefore reversed, without a new trial.

BROOKE, C. J., and McALVAY, KUHN, STONE, OS-TRANDER, BIRD, and MOORE, JJ., concurred.