## WHITE v. NEW YORK LIFE INS. CO.
### No. 10919.

Circuit Court of Appeals, Fifth Circuit.

Nov. 9, 1944.

Rehearing Denied Dec. 11, 1944.

Horace C. Wilkinson, of Birmingham, Ala., for appellant.

Borden Burr and J. T. Stokely, both of Birmingham, Ala., for appellee.

Before SIBLEY, McCORD, and LEE, Circuit Judges.

LEE, Circuit Judge.

Appellant, as beneficiary of a life insurance policy issued by the appellee on the life of her husband, Harry L. White, seeks to recover of appellee the sum of $5,000 allegedly due in addition to the face of the policy under the double indemnity provision by which White was insured against accidental death. Suit was filed in the Circuit Court of Jefferson County, Alabama, and was by appellee removed to the United

States District Court on the ground of diversity of citizenship.

The complaint alleged that the insured's death resulted directly and independently of all other causes from bodily injuries effected solely through external, violent, and accidental causes:

1. By taking an overdose of chloral and sodium bromide by mistake approximately 48 hours before his death.

2. By falling and striking his head against a dresser or the glass top thereof approximately 48 hours before his death.

At the close of appellant's case, the court below granted a motion of appellee for a directed verdict and charged the jury as requested by appellee "that you find the issue in favor of the defendant."

The sole issue is whether the court below erred in granting that motion and in giving the charge referred to.

The pertinent provisions of the policy are as follows:

"Double Indemnity: * * * Ten Thousand * * * Dollars (Double the face of this Policy) upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, and that such death occurred within ninety days after sustaining such injury, subject to all the terms and conditions contained in Section 2 hereof.

\* \* \* \* \*

"Section 2—Double Indemnity

"The provision for Double Indemnity Benefit on the first page hereof will not apply if the insured's death resulted * * * directly or indirectly from physical or mental infirmity, illness or disease of any kind."

Harry L. White died on May 3, 1940, in the Tutwiler Hotel, in Birmingham, Alabama. At the time of his death, he was 71 years of age. For some years prior to his death he had been under treatment by Dr. J. G. Vance, his personal physician.

Dr. Vance testified that about five years before Mr. White's death his health noticeably began to decline due to heart trouble, which progressively became worse until the time of his death. In September of 1939, White was in a hospital and was attended by Dr. Hirsch, a heart specialist of Birmingham. In January of 1940, he married appellant and went on a honeymoon to Florida. While there he was under medical attention. He returned from Florida to Birmingham in February of 1940, went to an infirmary, and was again attended by Dr. Hirsch, and by other physicians, some of whom treated him for kidney trouble. He left the sanitarium in the latter part of February, 1940, and established himself at the Tutwiler Hotel, where Dr. Vance again took him in charge. Dr. Vance found that he had pus in his urine and stated that while he was "able to clear up to some extent or all extent the pus, that didn't do his heart any good." White soon began to "experience periods of restlessness at night"; developed swelling of the limbs; and Dr. Vance had him consult Dr. Carter, another heart specialist. Carter's report confirmed Dr. Vance's diagnosis and confirmed Dr. Vance in his opinion that White was in a serious condition.

Dr. Vance testified that he visited White in his room the evening of Monday, April 29, 1940, and found him nervous, weak, and complaining of inability to sleep. His heart was then in a bad condition and getting worse. The doctor ordered a prescription, which was delivered in a bottle that evening.

Appellant testified that she gave White one dose out of the bottle about 9 o'clock, and that he went to sleep in about fifteen minutes. Later in the night he awoke very restless and changed from bed to bed. She went to bed between 1:30 and 2 a.m., and when she awoke, startled, between 4 and 4:30 a.m., she noticed that the glass top on the dresser had slipped half way off. She found White on the floor, unconscious, in the corner of his room. Dr. Vance was called and reached the room around 6 or 6:30 a.m., and was with him two or three times a day and at night until he died on Friday morning, May 3. No other physician attended the insured during that time.

Dr. Vance testified that when he reached White early on the morning of April 30, he had not seen him since he attended him on the evening before and did not know what had happened since the evening before, except from physical findings. He found White was unconscious, his heart condition had worsened, and he had a bump on his head so small that it required no treatment and disappeared in two days. The doctor did not know how he got the bump and attached no importance to it.

Appellant further testified that after giving White a dose of medicine from the

bottle about 9 o'clock in the evening, she placed the bottle of medicine and the spoon in the medicine cabinet in the bathroom and that at that time the medicine was almost level with the top of the bottle; that when Dr. Vance arrived, following her discovery of White on the floor, about one-third of the medicine in the bottle was gone; that Dr. Vance on arrival went into the bathroom and came out with the bottle of medicine in his hand and exhibited the bottle to her and said, "Harry [Mr. White] has had an overdose of medicine." Appellant stated that White had a habit of taking medicine by turning the bottle up and guessing at how much he was going to take; and that White was the only person who had access to the medicine after she retired.

After White's death, Dr. Vance signed a certificate of death, which, among other things, showed the following:

"Date of death

"May 3, 1940 * * *

"Immediate cause of death.

"Degenerative Myocardial Fibrosis * * *

"I hereby certify that I attended the deceased from March 15, 1940, to May 3, 1940, that I last saw him alive on May 3, 1940, and that death occurred at 8 a.m. on the date stated above from cause given."

With reference to the statements made in the certificate, Dr. Vance testified that it was his opinion at the time that myocardial degeneration was the immediate cause of White's death; and that "I know it is a contributory cause now, and bound to be a contributory cause." He further testified that "if this bump on his head or this overdose * * * he may have taken had anything to do with his death, they all contributed together," and that "if it hadn't been for his heart trouble the others wouldn't amount to anything at all."

Dr. Vance signed proofs of death under date of May 7, 1940, which contained the following statements:

"For what disease did you treat or advise deceased prior to last illness. Myocardial degeneration.

"Give date, duration and result of each. Five years.

"10(a). What was the immediate cause of death? Myocardial fibrosis.

"How long, in your opinion, did deceased suffer from this disease? Gradual onset."

With reference to these statements he testified that, at the request of the beneficiary's attorney, he wrote out and attached to the proof of death a typewritten slip containing this summary of what information had been gathered: "Deceased took overdose of chloral and sodium bromide, approximately 48 hours before his death to make him sleep. This was a mistake. During the night sometime he was found on the floor and from position of dresser and glass top on same, it was presumed he fell and struck his head. He never regained consciousness from then on until his death."

In explanation of this statement, Dr. Vance, as a witness, said that he didn't mean that the bump on White's head was the sole cause of his death; that the immediate cause of his death was the heart trouble, and that the overdose of chloral, assuming that he took it, would not have produced death or effected death but for his heart trouble; that it would be guesswork to say that the little bump found on his head could have produced death. "Q. And you still say, as you say on the death certificate, and as you said here, and as you say now, that one of the causes of his death was his heart condition? A. Yes, sir."

We agree with the court below that under the evidence the little bump on the back of Mr. White's head at the time he was found lying on the floor unconscious, which disappeared without treatment within a day or two, hardly merits consideration. The evidence, however, would warrant the jury in finding that White took by mistake an overdose of the medicine prescribed by Dr. Vance to produce sleep in the early hours of the morning on which he was found unconscious.

The testimony shows that, on the afternoon before, Dr. Vance had ordered and there was delivered a 4-ounce bottle of chloral and bromide containing about 240 grains. Mrs. White gave White a prescribed dose of this medicine around 9 o'clock in the evening, not long after the medicine was delivered. On the following morning when Dr. Vance was called in, he found about one-third of the medicine in the bottle was gone; he estimated that about 60 to 80 grains of the two drugs was missing. When Mrs. White went to sleep around 1:30 a.m., White was very restless, unable to sleep, and moving from bed to bed. White's restlessness and inability to sleep, when considered in the light of

the amount of medicine missing from the bottle and White's habit of pouring out medicine and guessing at the dose, are facts from which a jury might find that he had by mistake taken an overdose of the chloral and bromide. If, however, it is assumed that he took an overdose of the medicine by mistake, without knowing that it would be harmful, the question arises whether such taking would be an "accidental cause" within the meaning of the double indemnity clause of the policy.

■ The courts are in conflict on this question, some courts taking the view that, to be applicable, the cause must be accidental as well as the result flowing therefrom; while others take the position that only the results flowing therefrom need be accidental. As this suit is founded upon an Alabama contract the applicable rule must be determined by Alabama law.

In *Northam v. Metropolitan Insurance Company*, 231 Ala. 105, 163 So. 635, at page 636, 111 A.L.R. 622, the Supreme Court of Alabama, speaking through Mr. Justice Knight, said: "While some authorities seem not to draw, or to recognize, the distinction, yet by the great weight of the adjudged cases a distinction is drawn between an accidental result and a result which is caused by accidental means; the former class holding that the result need only be accidental, while the latter class hold that, not only must the result be accidental, but the cause or means which produced or brought about the result must also be accidental."

The opinion, at page 639 of 163 So., concluded: "Thus it appears that, before a recovery can be had, the wound must not only be a visible one, but it (the wound) must have been caused by violent and accidental means. While the plaintiff's injury and consequent disability may be in a sense accidental, yet that is not sufficient; the wound through which the septic infection entered plaintiff's body must have been caused by accident. The evidence shows that this wound was intentionally made by plaintiff by the use of the needle and tweezers; and, while the results were unexpected, unforeseen, and unusual, the language of the policy precludes recovery."

■ The double indemnity provision of the policy sued on by appellant provides not only that the death of the insured must result directly and independently of all other causes from bodily injury effected solely through external, violent, and accidental means, within ninety days after sustaining such injury, but that such death is subject to all of the terms and conditions contained in section 2 of the policy; and section 2 provides that the double indemnity benefit will not apply if the insured's death resulted directly or indirectly from physical or mental infirmity, illness, or disease of any kind. Under these provisions death must not only be caused from bodily injury effected through accidental cause, but it must not result directly or indirectly from physical or mental infirmity, illness, or disease.

■ When the evidence is considered in the light of these provisions in the policy, it seems clear that if it be assumed that the insured took by mistake an overdose of medicine and that he had an accidental fall, and that either or both contributed to his death, appellant would not be entitled to recover in view of the positive and uncontroverted evidence that the insured's heart condition likewise contributed to his death.

A double indemnity provision in a policy on all fours with that now before us was under consideration by this court in *Davis v. Jefferson Standard Life Insurance Company*, 5 Cir., 73 F.2d 330, 331, 96 A.L.R. 599. In the Davis case the insured died under an anesthetic administered by his surgeon in the performance of an abdominal operation. The appeal in that case, as here, was from a directed verdict by the district court. This court said: "In this count the anesthetic is set up as the direct and efficient cause of death. Its use was intentional and no mistake or slip is alleged in its administration. In addition to its usual and expected sedative results, there occurred an unexpected result due to a heart weakness of short duration but antedating the operation. That there was an accidental death caused in part by an external means (the anesthetic), which by a strain is held to be violent, is apparent; that the means was an accidental one is not so plain, as no mistake or slip occurred in its use. By the weight of authority a means is not made accidental because some unexpected result followed in addition to that which was intended to be accomplished. *Landress v. Phoenix Mutual Life Ins. Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, 90 A.L.R. 1382. But irrespective of that, it is clear to us that the fatality cannot be said to have been effected solely by this external violent means, because it

was due also to the internal bodily weakness without which there would have been no death. This was also a 'bodily infirmity' within the clause of exception, for infirmity includes abnormal weakness as well as acute disease. Insurance against death by accident is usually afforded for a small premium, and the coverage is correspondingly narrow. The liability is guarded by carefully chosen words. Courts have no more right by strained construction to make the policy more beneficial by extending the coverage contracted for than they would have to increase the amount of the insurance. The insurance here is not against unintended death from bodily injury effected by violent, external means generally, but only when the violent, external means can be said to be accidental and when they solely and independently of all other causes produce the death. If a bodily infirmity, though unknown at the time, is a concurring cause without which death would not have resulted, the policy does not cover the case. Landress v. Phoenix Mutual Life Ins. Co., supra; Travelers' Protective Association v. Davis, supra [5 Cir., 67 F.2d 260]; Ryan v. Continental Casualty Co., 5 Cir., 47 F.2d 472."

Again at page 332 of 73 F.2d: "Under the third count, which is based on the administration of the anesthetic as the direct cause of death, the heart condition is positively and uncontradictedly testified to be a concurring cause of the death without which it would not have happened."

In Ryan v. Continental Casualty Company, 5 Cir., 47 F.2d 472, 473, cited in the Davis case, this court in an opinion by Judge Walker said: "Though the insured sustained a personal injury by the happening of an external violent and purely accidental event, his death was not brought about solely and independently of all other causes by that accident, if, at the time the accident occurred, it would not have caused his death if he had not then been afflicted with a previously existing disease or infirmity, and if the accident had not aggravated the effect of the disease or infirmity, or the disease or infirmity had not aggravated the effect of the accident. National Masonic Acc. Ass'n v. Shryock, 8 Cir., 73 F. 774; Kerns v. Aetna Life Ins. Co., 8 Cir., 291 F. 289; Aetna Life Ins. Co. v. Ryan, 2 Cir., 255 F. 483; Commercial Travelers' Mut. Acc. Ass'n v. Fulton, 2 Cir., 79 F. 423."

In Aetna Life Insurance Company v. Ryan, 2 Cir., 255 F. 483, 486, cited by Judge Walker, the court said: "The cases established the principle that, if death results from disease or a bodily infirmity, there can be no recovery under such a policy whether the insured suffered an accident or not. And they also show that there can be no recovery if the insured sustained an accident but at the time it happened was afflicted with a pre-existing disease and if death would not have resulted if he had not had the disease, but 'his death was caused because the accident aggravated the effects of the disease or the disease aggravated the effects of the accident. National Masonic Accident Association v. Shryock, 8 Cir., 73 F. 774, 20 C. C. A. 3; Maryland Casualty Co. v. Morrow, 3 Cir., 213 F. 599, 130 C.C.A. 179, 52 L.R.A.,N.S., 1213; Preferred Accident Ins. Co. v. Patterson, 3 Cir., 213 F. 595, 130 C.C.A. 175; Illinois Commercial Men's Ass'n v. Parks, 7 Cir., 179 F. 794, 103 C.C.A. 286; Stanton v. Travelers' Ins. Co., 83 Conn. 708, 78 A. 317, 34 L.R.A.,N.S., 445; Stokely v. F. & C., 193 Ala. 90, 69 So. 64, L.R.A.1915E, 955; Pacific Mutual Life Ins. Co. v. Despain, 77 Kan. 654, 95 P. 580; Aetna Life Ins. Co. v. Bethel, 140 Ky. 609, 131 S. W. 523; White v. Standard Life & Accident Ins. Co., 95 Minn. 77, 103 N.W. 735, 884, 5 Ann.Cas. 83; Thomas v. Fidelity & Casualty Co., 106 Md. 229, 67 A. 259; Robison v. United States H. & A. [Ins. Co.], 192 Ill.App. 475; Continental Casualty Co. v. Peltier, 104 Va. 222, 51 S.E. 209; Jiroch v. Travelers' Ins. Co., 145 Mich. 375, 108 N.W. 728; Ward v. Aetna Life Ins. Co., 85 Neb. 471, 123 N.W. 456; Penn v. Standard Life & Accident Ins. Co., 158 N.C. 29, 73 S.E. 99, 42 L.R.A.,N.S., 593."

Appellant cites, relies on, and quotes at length from the Supreme Court of Alabama in Benefit Association of Railway Employees v. Armbruster, 224 Ala. 302, 140 So. 356, 357. In that opinion the Supreme Court of Alabama expressly stated that the policy under consideration did not contain a clause excluding liability where death had resulted wholly or in part, directly or indirectly, from disease or bodily infirmity. The language of the court is as follows: "As pointed out on first appeal, supra, the policy insures against 'loss resulting directly and exclusively of all other causes, from bodily injury sustained * * * solely through external, violent and accidental means,' and does not contain the clause

considered in some cases, excluding liability 'where death has resulted wholly or in part, directly or indirectly, from disease or bodily infirmity.' "

■ The burden was upon appellant to show that her husband's death resulted exclusively and independently of all other causes from bodily injuries effected solely through external, violent, and accidental cause, and did not result directly or indirectly from physical or mental infirmity, illness, or disease of any kind.[1] This burden, we think, as did the court below, she utterly failed to discharge.

■ In the Federal courts where the evidence in favor of one party is so overwhelming that the judge in the exercise of sound discretion would be obliged to grant a new trial if the jury rendered a verdict in favor of the other party, it is his duty to direct a verdict.[2] The rule of practice to the effect that a mere scintilla of evidence is sufficient to require submission to the jury has never obtained in the Federal courts.[3]

We find no error in the rulings complained of.

Judgment affirmed.

---

[1] Ryan v. Continental Casualty Co., 5 Cir., 47 F.2d 472; Travelers' Ins. Co. v. Wilkes, 5 Cir., 76 F.2d 701; Inter-Ocean Casualty Company v. Jordan, 227 Ala. 383, 150 So. 147.

[2] Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Daroca v. Metropolitan Life Ins. Co. et al., 5 Cir., 121 F.2d 917.

"When, on the trial of the issues of fact in an action at law before a Federal court and a jury, the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party." Slocum v. New York L. Ins. Co., 228 U.S. 364, 369, 33 S.Ct. 523, 525, 57 L.Ed. 879, 882, Ann. Cas.1914D, 1029.

[3] Daroca v. Metropolitan Life Ins. Co. et al., 5 Cir., 121 F.2d 917; Gunning v. Cooley, 281 U.S. 90, 91, 50 S.Ct. 231, 233, 74 L.Ed. 720.

"If the intention is to claim generally that the amendment (7th Amendment to the Constitution of the United States) [preserving the right of trial by jury,] deprives the federal courts of power to direct a verdict for insufficiency of evidence, the short answer is the contention has been foreclosed by repeated decisions made here consistently for nearly a century." Galloway v. United States, 319 U.S. 372, 389, 63 S.Ct. 1077, 1086, 87 L.Ed. 1458, 1470.