## RUONA v. NEW YORK LIFE INS. CO.
### Civil Action No. 153.

District Court, W. D. Michigan, N. D.

Dec. 12, 1946.

Francis A. Bell, of Ishpeming, Mich., Bernard H. Davidson, of Negaunee, Mich., and James P. Clancey, of Ishpeming, Mich., for plaintiff.

Laurent K. Varnum and Travis, Merrick, Varnum & Riddering, all of Grand Rapids, Mich., and Eldredge & Eldredge, of Marquette, Mich., for defendant.

STARR, District Judge.

Plaintiff and her husband, Kusta A. Ruona, were residents of the city of Ishpeming, Michigan. He was about 73 years of age and for many years it had been his custom to take steam baths. At about two o'clock in the afternoon of November 6, 1942, he went to a privately-operated bath establishment in Ishpeming to take a steam bath. He had previously taken baths in this establishment, and it may reasonably be inferred that he was familiar with the equipment and facilities. It appears that he went into the private bath room assigned to him, in which there was an upper floor on which was located a cement bench for the bather's use. In front of the bench was a hot radiator and directly above this was a water faucet. The procedure was for the bather to open the faucet, and the water, spraying on the hot radiator, would create steam. The bather could control the amount of water sprayed on the radiator and thereby control the amount of steam and the resultant temperature of the bath room. At some time between three-thirty and four o'clock that afternoon the proprietor of the bath house became somewhat concerned because deceased had remained so long in the steam-bath room, and called his son from a nearby store. On entering the bath room they found deceased lying on the bench in an unconscious condition. There was a superficial abrasion on the left side of his forehead. The water faucet had apparently not been turned off, and the continued flow of water on the hot radiator had greatly increased the temperature of the room. On the advice of Dr. McCann, who was called and who examined him, the deceased was removed to a hospital, where he died the next day, November 7th. Later, an autopsy was performed by Dr. Tharinger, representing the defendant company, and by Dr. McCann. At the autopsy, specimen sections of tissue of the brain, pituitary gland, heart, lungs, kidneys, and other organs of deceased's body were removed, and these specimens were sent to Dr. Weller, physician and pathologist at the University of Michigan hospital, for examination.

At the time of his death plaintiff's husband held three insurance policies issued by defendant company in the aggregate face or principal amount of $4,000, in

924

which plaintiff was designated as beneficiary. In each policy defendant agreed to pay the beneficiary the face of the policy upon receipt of due proof of the death of the insured; or to pay:

"Double the face of this policy upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, and that such death occurred within sixty days after sustaining such injury."

The policies further provided:

"This double indemnity benefit will not apply if the insured's death resulted * * * from physical or mental infirmity; or directly or indirectly from illness or disease of any kind."

Plaintiff furnished due proof of her husband's death and demanded payment of double indemnity, which defendant refused. She later began the present suit in the circuit court for Marquette county, claiming that under the above-quoted provisions of the policies she was entitled to recover double indemnity in the amount of $8,000. On defendant's petition the suit was removed to this court. In its answer defendant admitted liability for $4,000, as the face or principal amount of the policies, but denied liability for double indemnity. The case was tried before the court sitting without a jury. In the course of the trial defendant stipulated and agreed that it was liable for single indemnity of $4,000 and that it was holding such sum for plaintiff, subject to withdrawal on her demand. Therefore, the only issue for determination is whether or not plaintiff is entitled to recover double indemnity.

The burden was on plaintiff to establish that her husband's death "resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause" and that his death did not result "from physical * * * infirmity; or directly or indirectly from illness or disease of any kind." New York Life Insurance Co. v. Gamer, Executrix, 303 U.S. 161, 58 S.Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218; Harrison v. New York Life Ins. Co., 6 Cir., 78 F.2d 421; Koycheff v. Mutual Benefit Health & Accident Ass'n, 305 Mich. 660, 9 N.W.2d 883. Dr. Weller, the pathologist who examined the tissue specimens removed at the autopsy, testified in part:

"Q. * * * What did the examination of the heart tissue show? * * * A. In the heart was found brown atrophy of the myocardium. Advanced coronary atherosclerosis. Heavy lymphocyte and plasma cell infiltration in the adventitia of some of the coronary arteries. One of the smaller coronary branches shows complete earlier obliteration. * * *

"These changes are such as are commonly found in the hearts of men the age of K. A. Ruona, which was stated to me to be 73. The changes in the coronary arteries are marked but are not unusual. The small coronary branch which was completely obliterated had suffered that change months or years before the death of the patient. * * *

"The lungs showed * * * intense well-marked acute passive congestion, acute edema, hemorrhage into the alveoli. * * *

"The kidneys showed acute passive congestion, cloudy swelling. * * *

"The pathological diagnosis based upon the microscopical examination was acute circulatory failure. * * *

"The arterial changes in the heart are those frequently found in men of this age and would have some effect in lowering the efficiency of the circulation. * * *

"My opinion based on the examination of the tissues alone would be expressed in the statement that death was due to acute circulatory failure. * * *

"The changes in the brain are such as might be associated with a state of unconsciousness but the changes in the brain did not indicate concussion from physical trauma. * * *

"The changes in the brain indicated acute circulatory failure with marked edema and fully compatible with circulatory failure, associated with elevated body temperature. * * *

"My opinion is that circulatory failure was induced in a susceptible individual as a result of the heat exhaustion and that the contusion (on the forehead), if present, was produced when he fell after he became unconscious. * * *

"My opinion would be that the fall was the result of his becoming unconscious and not his unconsciousness the result of his fall.

"Q. * * * What would cause him to become unconscious? A. The changes in the brain resulting from hyperthermia, increased body temperature. * * *

"In view of the known sequence of events, it seems proper to conclude that in this instance, heat exhaustion precipitated circulatory failure in a patient who was especially vulnerable because of his narrowed or obliterated coronary arteries. An unusual exertion might have had the same effect. * * *

"I would say that age and previous bodily infirmities made him more vulnerable to heat exhaustion than would otherwise have been the case. * * *

"Q. Doctor, it might be fairly stated I think that in the case of Mr. Ruona, exposure to heat in all probability would not have resulted in his death had it not been for the diseased condition of his arteries? Is that true? A. I think that is true. * * *

"My opinion is that he died when he did because of exposure to the heat of the steam bath."

Dr. McCann, the personal physician of the deceased, who had examined and treated him prior to his death, and who attended him at the hospital and assisted in the autopsy, testified in part:

"I originally saw him (deceased) on September 16, 1941. * * *

"The last time I saw him was October 12 (1942), and his condition was good at that time. * * *

"I treated him only for a mild secondary anemia. * * *

"Q. * * * Can you say with reasonable certainty what caused his death? A. * * * The primary cause was heat stroke, and the contributing cause was circulatory failure. * * *

"The extreme heat precipitated the circulatory failure. * * *

"The coronary arteriosclerosis, of course, was an aging process that you would expect to find in a man of the age of 73. * * *

"Q. * * * From your examination of him did he in your opinion show any symptoms of arteriosclerosis? A. * * * Of course, he had some arteriosclerotic changes; * * * but no more so than another man his age would have. * * *

"Q. * * * In giving your diagnosis you used the word 'heat stroke,' do you mean the same thing by 'heat stroke' that Dr. Weller means by 'heat exhaustion'? A. They produce the same pathological results, but their subjective symptoms are somewhat different. * * *

"Sunstroke and heat stroke are the same; they are synonymous. * * *

"Q. * * * Dr. Weller recognizes that * * * this diseased condition of his heart was a contributing cause of his death; would you agree to that? * * * A. Yes. * * *

"I think the heat precipitated the condition, that the condition of his heart precipitated the circulatory failure because of the heat stroke. * * *

"In this instance a man of 73 years of age, he has an aging process of arteriosclerosis, and heart changes due to the aging process. That factor could be a contributory one to his circulatory failure. * * *

"The Court: * * * The words 'heat stroke,' 'heat prostration,' 'heat exhaustion' have all been used; I ask you, are those terms used synonymously in the medical profession? A. * * * No, the end result is the same, but the clinical findings, when you examine a patient, are different. * * * I don't think the pathology will change much, as between those."

Becoming unconscious in the steam bath was the initial step in the chain of events which ended in the death of deceased. There was no proof establishing,

or from which it could be reasonably inferred, that his unconscious condition resulted from his fall onto the cement bench, which fall apparently caused the contusion on his forehead. In fact, Dr. Weller testified in substance that in his opinion the deceased became unconscious before he fell, because of hyperthermia or increased body temperature. Being unconscious and unable to control the flow of water on the hot radiator, the temperature of the bath room increased to a degree that caused heat stroke or heat prostration. This condition, combined with the arteriosclerotic condition of his heart and arteries, resulted in acute circulatory failure and death. The evidence clearly establishes that the arteriosclerotic condition made the deceased more vulnerable to circulatory failure from the heat stroke or prostration. The question is, did his death under these circumstances result "directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause" and not from "physical * * * infirmity; or directly or indirectly from illness or disease of any kind," as provided in the double-indemnity provisions of the policies?

It had been deceased's custom for many years to take steam baths, and when he entered the bath room on November 6th, he voluntarily and intentionally exposed himself to the effects of the steam and heat. His exposure did not result from any fortuitous or accidental event, and it might reasonably be compared to the case of one who knowingly exposes himself to the heat of the sun or to extreme cold. The temperature of the bath room was under his control until he became unconscious. His unconsciousness and the resulting heat stroke or prostration were, of course, unexpected and unforeseen consequences of his taking the steam bath, but they were not fortuitous events and were not an "external, violent and accidental" cause of his death as provided in the double-indemnity provisions of the policies. In other words, his death was an unexpected and unforeseen result, but it was not caused by external, violent and accidental means. A substantially-similar policy provision was considered in the case of Landress v. Phoenix Mutual Life Insurance Co., 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, 90 A.L.R. 1382. In that case the death of the insured resulted from sunstroke while playing golf. In affirming the Circuit Court of Appeals for the Sixth Circuit which denied recovery, the court in its majority opinion said (291 U.S. pp. 495-497, 54 S.Ct. 462):

"It is not enough, to establish liability under these clauses, that the death or injury was accidental * * * that the result of the exposure 'was something unforeseen, unexpected, extraordinary, an unlooked-for mishap * * *' * * * for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental. The external means is stated to be the rays of the sun, to which the insured voluntarily exposed himself. Petitioner's pleadings do not suggest that there was anything in the sun's rays, the weather, or other circumstances, external to the insured's own body and operating to produce the unanticipated injury, which was unknown or unforeseen by the insured. * * *.

"This distinction between accidental external means and accidental result has been generally recognized and applied where the stipulated liability is for injury resulting from an accidental external means. See Ætna Life Ins. Co. v. Brand, 2 Cir., 265 F. 6, 13 A.L.R. 657; Lincoln National Ins. Co. v. Erickson, 8 Cir., 42 F.2d 997; Jensma v. Sun Life Assur. Co., 9 Cir. [64 F.2d 457]; Order of United Commercial Travelers v. Shane, 8 Cir., 64 F.2d 55; contra, Mutual Life Ins. Co. v. Dodge, 4 Cir., 11 F.2d 486, 59 A.L.R. 1290. And injury from sunstroke, when resulting from voluntary exposure by an insured to the sun's rays, even though an accident, see Ismay, Imrie & Co. v. Williamson [1908] A.C. 437, has been generally held not to have been caused by external accidental means."

A double-indemnity provision similar to that in the policies before the court was considered in Nickman v. New York Life Ins. Co., 6 Cir., 39 F.2d 763. In that case the deceased died as a result of a sunstroke, and in denying the beneficiary recovery, the court said (pages 764, 765):

"Nothing occurred at any time to cause the insured to be involuntarily exposed. He went exactly when, where, and as he intended to go throughout the day. He did just as he intended to do. He was exposed by no mishap or misadventure as in Elsey v. Fidelity & Casualty Co., 187 Ind. 447, 120 N.E. 42, L.R.A.1918F, 646, where the insured suffered a sunstroke because a street car in which he was sitting had been drawn from the shade into the sun; or, as in Richards v. Standard Acc. Ins. Co., 58 Utah, 622, 200 P. 1017, 17 A.L.R. 1183, where from misinformation as to the distance to be traveled into the desert, the insured took an insufficient supply of water; or, as in the illustration in the English case of Sinclair v. Maritime Passengers Assur. Co., 3 El. & El. 487, of one at sea in an open boat by reason of shipwreck; or, as in Manufacturers Acc. Indem. Co. v. Dorgan, 6 Cir., 58 F. 945, 953, 22 L.R.A. 620, where the insured, unconscious from a temporary affliction, fell into a brook and drowned; or, as in Ashley v. Agr. Life Ins. Co., etc., 241 Mich. 441, 217 N.W. 27, 58 A.L.R. 1208, where a hunter became lost and died from freezing * * *. He did not, of course, intend to be stricken, and his death was therefore unexpected, but it was not caused by accidental means. The best that may be said for plaintiff's case is that the insured's death was unexpectedly brought about by acts which the insured himself intentionally committed. While going about his business affairs, he simply exposed himself to the heat longer than his body could endure."

In Metropolitan Life Ins. Co. v. Bukaty, 10 Cir., 92 F.2d 1, 3, the court said:

"The policy here insured against accidental cause or means as distinguished from accidental result.

"Sunstroke or heatstroke when it is caused by voluntary exposure to the sun's rays or to artificial heat and not by unexpected, unanticipated, or unintentional exposure thereto is not caused by accidental means."

In M. P. Cornelius on Accidental Means, 1932 Ed., p. 64, it is stated:

"A sunstroke can only be considered to be effected by accidental means in those exceptional cases where it appears that some accidental event has occurred, and, as a result thereof, the insured has been exposed to the heat of the sun in a way not intended. There must be an element of accident in the means bringing about the exposure."

See, also, White v. New York Life Ins. Co., 5 Cir., 145 F.2d 504; Davis v. Jefferson Standard Life Ins. Co., 5 Cir., 73 F. 2d 330, 96 A.L.R. 599; Northam v. Metropolitan Insurance Co., 231 Ala. 105, 163 So. 635, 111 A.L.R. 622; Ridgeley Protective Ass'n v. Smith, 42 Ohio App. 417, 182 N.E. 345.

In Doyle v. City of Saginaw, 258 Mich. 467, 243 N.W. 27, and Bellinger v. Hersey Gravel Co., 267 Mich. 26, 255 N.W. 443, the court determined that sunstroke was not a compensable accident within the meaning of the Michigan workmen's compensation law. In Bailey v. Henry Knapp & Co., 284 Mich. 395, 279 N.W. 875, the court held that heat stroke was not an accidental injury under the workmen's compensation law. In the Doyle Case the court said (258 Mich. at page 472, 243 N.W. at page 29): "Heatstroke and sunstroke are so similar that the terms are frequently used interchangeably." In the present case Dr. McCann testified that a heat stroke and a sunstroke produced substantially the same clinical conditions. Therefore, the above-quoted holding of the court in Landress v. Phoenix Mutual Life Insurance Co. and the holdings in other cases involving death from sunstroke are directly applicable to the present case involving heat stroke or heat prostration.

Plaintiff cites and relies upon Richards v. Standard Acc. Ins. Co., 58 Utah 622, 200 P. 1017, 17 A.L.R. 1183; Ashley v. Agricultural Life Insurance Co. of America, 241 Mich. 441, 217 N.W. 27, 58 A.L.R. 1208; and Hoff v. Mutual Life Insur-

ance Co. of New York, 266 Mich. 380, 254 N.W. 137. Those cases are distinguishable from the present case because in each there was a fortuitous and accidental event which the courts relied upon in granting recovery. In the present case there was no proof of a fortuitous or accidental event.

The court concludes that plaintiff failed to establish, as required by the double-indemnity provisions of the policies, that the insured's death resulted "directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause."

Furthermore, the undisputed testimony establishes that decedent's impaired heart condition was a contributing cause of his acute circulatory failure and death. The policies expressly provided that the double-indemnity benefit would not apply if the insured's death resulted "from physical * * * infirmity; or directly or indirectly from illness or disease of any kind." In considering a somewhat similar policy provision in Bristol v. Mutual Benefit Health & Accident Association, 305 Mich. 145, 152, 9 N.W.2d 38, 41, the court said:

"If the policy expressly excludes liability for death resulting directly or indirectly from bodily infirmity, illness, or disease, the accident itself must have been sufficient to cause death. Rathman v. New Amsterdam Cas. Co., 186 Mich. 115, 152 N.W. 983, L.R.A.1915E, 980, Ann.Cas. 1917C, 459; Budzinski v. Metropolitan Life Ins. Co., 287 Mich. 495, 283 N.W. 662, 286 N.W. 842."

In considering a double-indemnity policy provision practically identical with that in the present case, in Budzinski v. Metropolitan Life Insurance Co., 287 Mich. 495, 503, 283 N.W. 662, 666, 286 N.W. 842, the court said:

"In this state we have adopted the rule that the beneficiary can recover if the accident was the efficient, dominant, proximate cause of the disability or death although a pre-existing disease may have contributed to the result."

This holding in the Budzinski Case is in accord with the above-quoted statement in the Bristol Case that "the accident itself must have been sufficient to cause death." In the present case there was no proof establishing, or from which it could be inferred, that the heat stroke or prostration would have caused death, had not the deceased been vulnerable to circulatory failure because of his impaired heart condition. Dr. Weller testified in substance that in his opinion the exposure to heat would probably not have resulted in death, had it not been for this impaired heart condition. Therefore, it cannot be said that the heat stroke or prostration alone was sufficient to have caused death. In considering a policy provision somewhat similar to that involved in the present case, the court said in Aetna Life Ins. Co. v. Ryan, 2 Cir., 255 F. 483, 486:

"The cases establish the principle that * * * there can be no recovery if the insured sustained an accident but at the time it happened was afflicted with a preexisting disease and if death would not have resulted if he had not had the disease, but his death was caused because the accident aggravated the effects of the disease or the disease aggravated the effects of the accident."

See, also, Ryan v. Continental Casualty Co., 5 Cir., 47 F.2d 472; White v. New York Life Ins. Co., supra.

In the present case the arteriosclerotic condition of the deceased's heart and arteries made him vulnerable to circulatory failure from heat stroke or prostration, and this physical infirmity was a contributing cause of his death. Therefore, plaintiff failed to establish, as provided in the double-indemnity provisions of the policies, that the insured's death did not result from physical infirmity or directly or indirectly from illness or disease.

In summary, plaintiff failed to establish her right to recover under the double-indemnity provisions of the policies.

### Findings of Fact.

(1) That plaintiff is a citizen of the State of Michigan; that defendant is a

foreign corporation authorized to do business in Michigan; that the matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

(2) That deceased, who was 73 years of age, was afflicted with a heart disease or condition described as "coronary arteriosclerosis," which was attributable to his age.

(3) That at about two o'clock in the afternoon of November 6, 1942, he went to a privately-operated bath establishment in the city of Ishpeming to take a steam bath.

(4) That he had previously taken baths in this establishment, and it may reasonably be inferred that he was familiar with the steam-bath facilities and the operation thereof.

(5) That while in the steam-bath room he became unconscious and fell onto a cement bench, causing a superficial abrasion on his forehead; that his unconsciousness resulted either from his arteriosclerotic heart condition, or from the high temperature in the room, or from a combination of these factors.

(6) That, being unconscious and unable to control the flow of water on the hot radiator, the temperature in the bath room increased to a degree which caused fatal impairment of his bodily functions.

(7) That his fall onto the cement bench after becoming unconscious was not a causative factor in his death. That a tumor in his pituitary gland, which was disclosed by the autopsy, was not a causative factor in his death.

(8) That his death in the hospital the following day was due to acute circulatory failure resulting from heat stroke or heat prostration, and that the impaired condition of his heart and arteries made him more vulnerable to the circulatory failure and was a contributing cause of his death.

(9) That defendant admits liability for the face or principal of the policies in the amount of $4,000, and that at plaintiff's instruction it is holding this sum for her benefit, payable to her on demand.

## Conclusions of Law

(1) That this court has jurisdiction of the parties and the subject matter of this suit.

(2) That in this action to recover under the double-indemnity provisions of the life-insurance policies in question, the burden was upon plaintiff to establish that her husband's death "resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause" and that it did not result "from physical * * * infirmity; or directly or indirectly from illness or disease of any kind."

(3) That, having voluntarily exposed himself to the effects of the steam and heat in a steam bath, to which he was accustomed, his unconsciousness and the resulting heat stroke or prostration, though unexpected and unforeseen, were not fortuitous events and were not an "external, violent and accidental cause" of his death, as provided in the double-indemnity provisions of the policies.

(4) That plaintiff failed to establish that her husband's death resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause.

(5) That plaintiff failed to establish that her husband's death did not result "from physical * * * infirmity; or directly or indirectly from illness or disease of any kind."

(6) That plaintiff failed to establish her right to recover double indemnity.

As defendant admits liability for single indemnity of $4,000 and is holding that sum payable to plaintiff on her demand, it is unnecessary at this time to enter judgment therefor. However, the court retains jurisdiction, and if defendant should fail or refuse to pay said sum to plaintiff on demand, she may at any time move for judgment for such amount and accumulated interest thereon.

As plaintiff failed to establish her right to double indemnity, judgment of no cause of action shall be entered for defendant.